STATE, EX REL. GIROUX, RELATOR, *v.* GIROUX, RESPONDENT.

[Submitted January 21, 1897. Decided February 1, 1897.]

*Habeas Corpus—Evidence—Judgment of a Sister State—Control of Children.*

HABEAS CORPUS—*Evidence.*—A proceeding in *habeas corpus* is summary and unsubstantially technical rules of evidence should not control.

SAME.—In this proceeding, most of the evidence was in the form of depositions; *held*, that under such circumstances, the appellate court would review the deposition; and *held*, accordingly, that the evidence fairly showed a personal service of summons in the action hereinafter referred to.

JUDGMENT OF SISTER STATE.—A judgment of a sister state can be attacked for want of jurisdiction of the person of the defendant; but where such judgment is obtained upon personal service of summons within the jurisdiction of the court, it cannot be attacked collaterally for fraud, and the fact that defendant was not within the jurisdiction of the court, at the time the decree was entered, does not change the rule.

EVIDENCE.—Error cannot be based upon a refusal to admit in evidence a judgment which was subsequently allowed to be introduced.

HABEAS CORPUS—*Custody of children.*—At common law where the father and mother are equally fitted for the care of their child, the right of the father is superior.

SAME—*Evidence—Opinion.*—A witness canno. give his opinion as to whether the father or mother is the more suitable custodian of their minor child.

*Appeal from District Court, Flathead County. Charles W. Pomeroy, Judge.*

APPLICATION by the state, on the relation of Joseph L. Giroux, for a writ of *habeas corpus* against Rebecca Giroux. From a judgment for defendant, plaintiff appeals.    Reversed.

Statement of the case by the justice delivering the opinion.

This appeal is the result of a *habeas corpus* proceeding in

the district court of Flathead county for the custody of a minor child withheld by its mother from the father. The facts are substantially as follows :

Joseph L. Giroux and the respondent, Rebecca Giroux, were married in Montana in 1884, and soon thereafter removed to Arizona, of which territory Joseph L. Giroux is now, and was at all times hereinafter mentioned, a resident. On June 11, 1893, the respondent, Rebecca Giroux, left Arizona to spend the summer with relatives in Montana, taking with her the issue of said marriage—a boy, George L. Giroux, aged at the time six years, and a girl, Virginia Giroux, aged five years. On June 19, 1893, Joseph L. Giroux, in a district court of Arizona, commenced an action against the said Rebecca Giroux for a divorce, alleging as grounds therefor drunkenness, improper intimacy with another man, and cruel treatment on her part. In the complaint he prayed the court for the care and custody of the minor children aforesaid. Receiving intelligence of the institution of the said suit, Mrs. Giroux at once returned to Arizona from Montana, and was personally served with the summons in said suit. The validity of the service of said summons she questions, as will hereinafter appear. On the 8th day of July, 1893, an agreement of separation was entered into between the husband and wife. The said agreement recites that: "Whereas, the said parties have separated, and are now living separate and apart, and a suit for divorce has been instituted by the said party of the first part (Joseph L. Giroux) against the said party of the second part (Rebecca Giroux), which said suit is now pending in the district court of the Fourth judicial district of the territory of Arizona, in and for the county of Yavapai; and whereas, the said parties are desirous of arranging their property rights without litigation, and of providing for the custody, care, maintenance, and support of their children: Now, therefore, in consideration of the premises, and the sum of one dollar to each by the other paid, it is hereby mutually agreed by and between said parties as follows, to-wit: First. That the said first party

shall and will pay to the second party the sum of $4,300 in cash, the same to be paid on the 8th day of July, 1893, and that the said second party shall and does hereby accept said sum of $4,300 in full of all her right, title, share, and interest in and to the community property belonging to said parties, in full alimony, and in full of all her right, title, and interest in and to any and all property owned by said first party. Second. The said first party is to have the custody, care, and control of their infant son, George L. Giroux, and the second party is to have the custody, care, and control of their infant daughter, Mossie Virginia Giroux.'' This agreement was duly acknowledged before a notary public, whose certificate is attached thereto. Immediately after the agreement was entered into, Mrs. Giroux returned to Montana, where on July 26, 1893, she wrote the following letter to a Mrs. Murry: ''Kalispell, Mont., July 26, 1893. Mrs. Murry, Jerome, Arizona. Dear Friend: I hope you will excuse me for not writing to you sooner, but I have been so very busy since I have come back. I am getting George ready to go back and live with his father, while I have the custody of Virgie. I got a third of what Joe had, and can live very comfortably on that. My conscience is perfectly free from guilt. Clara has caused me a very great deal of trouble. I never would have another girl around me. She says that Barton promised to marry her if she would tell Joseph all those horrible things, and help to separate Joseph and I. They have accomplished what they wanted, and I hope they are happy. I would like to know what their object was in doing so. I have sent Clara away to Spokane, I don't want to ever see her again. I will close for this time, and please write and tell me all the news. From your friend, Rebecca Giroux.''

On July 17, 1893, after the departure of Mrs. Giroux for Montana, the Arizona court granted Joseph L. Giroux a decree of divorce on the grounds relied on in the complaint. It awarded the custody of the minor child, George L. Giroux, to the father. In his petition for a writ of *habeas corpus,*

Joseph L. Giroux sets forth the agreement for separation, and the Arizona decree of divorce aforesaid. In her amended return to the writ, Mrs. Giroux denies that any decree of divorce was ever obtained against her; denies that she ever appeared in the divorce suit, and alleges that, if she ever was served with summons therein, it was through fraud and deceit practiced upon her by her husband and others acting in his behalf. The details of said fraud are alleged substantially as follows: Mrs. Giroux's first knowledge of the decree of divorce was obtained when proceedings in *habeas corpus* were instituted for the custody of the boy. Her husband persuaded her to make a visit to Montana for the purpose of spending the summer there. Shortly after her arrival she received intelligence that a divorce suit had been instituted against her, and thereupon at once returned to Arizona. Arriving there, she immediately proceeded to the office of the clerk of the court, and demanded copies of all the files in the divorce action. These were not furnished to her at the time of the demand, but on July 5th she was handed a package of papers by an unknown person who informed her that they were the papers she had requested of the clerk. If any summons or copy of summons was ever delivered to her, it was in this package of papers. She did not examine the contents of said package at the time, but proceeded at once with it to her husband. When she showed and handed him the papers, he expressed regret for his action, and a desire for reconciliation, burned the papers, and told her he either had or would dismiss the divorce suit. Shortly afterwards, through misrepresentations as to its contents and the necessity for it, he induced her to sign the agreement for separation (heretofore set forth), and then induced her to return to Montana; alleging as a reason therefor that she and the children should remain away from Arizona until the scandal of the divorce action had blown over; telling her, also, that when it had, he would come and bring them back. She also set forth in her return or answer "that, at the time of the rendition of the pretended decree of divorce, she and the boy, George L. Giroux, were absent, and without the juris-

diction of the territory of Arizona, and residing within the state of Montana, and were so residing therein at the time of the institution of the divorce proceedings, and at all times subsequent thereto; that she is the natural guardian of George L. Giroux; that he and his sister, who are greatly attached to each other, should not be separated during their earlier life; that she is amply able to care for and educate said George L. Giroux; and that she is a fit and proper person to have the care and custody of him.'' She alleges ''that the said Joseph L. Giroux, is wholly unfitted for the care and custody of the said George L. Giroux, on account of his surroundings, business, and habits of life, inasmuch as he must rely wholly upon strangers to care for the said child, as his duties demand his presence away from home during the greater part of his time, and that the said Joseph L. Giroux on or about the 8th day of October, 1893, remarried with one Phœbe Marcutt, and that, if the custody should be awarded to the father, the boy would be placed in charge of a stepmother, whom the respondent is informed and believes has no experience in the care and custody of children, and who is unable to speak the English language, and who is entirely unfit, both by nature and education, for the care of said George L. Giroux.'' Joseph L. Giroux, in his replication to the return or answer of the respondent, specifically denies all charges of fraud and deceit; admits his marriage to Phœbe Marcutt, but denies that, if awarded the custody of the child, he would place him in the care of a stepmother; denies that his second wife has no experience in the care and custody of children, and that she is unable to speak the English language, and avers, on the contrary, that she is an educated American lady, who speaks the English language, and has had experience and is familiar with children, is of a kind and affectionate disposition, and fond of the society of children; denies any unfitness on his part for the care or custody of said child, but avers that he is well fitted for such custody, and is abundantly able and willing to rear and educate said child in a manner fitting his station in life. He admits that, at the time of the institution of the suit and the

rendition of the decree of divorce set up in his petition, the child, George L. Giroux, was temporarily within the state of Montana, and that he has remained there since that time. The trial of the issues resulted in a judgment awarding the custody of the child George L. Giroux to his mother until the further order of the court, and defendant relator, Joseph L. Giroux, appeals.

*W. F. Nossinger* and *F. H. Nash*, for Relator.

The agreement entered into between the appellant and the respondent as to the custody of the children and division of their property rights, was a perfect and legal instrument under the laws of Arizona territory and conclusive of the rights of the parties; unless in a case where it would be manifestly against public policy and reason for the child to remain under the custody of the one entitled to it under the contract. (*Dumain* v. *Gwynne*, 10 Allen (Mass.) 270; *Byrne* v. *Love*, 14 Texas 81; *State* v. *Rewff*, 29 W. Va , 751; *Bonnett* v. *Bonnett*, 61 Iowa 199.) The judgment in evidence is conclusive as to the matters in controversy. (*Christmas* v. *Russell*, 5 Wall. 290; 2d Vol. Freeman on Judgments, § 563; *Morrill* v. *Morrill*, 23 Am. St. Rep. 95 ; 2 Bishop on Marriage, Divorce and Separation, § 1139; *State* v. *Bechdel*, 5 Am. St. Rep. 854; *Miner* v. *Miner*, 11 Ill. 42; *Hewitt* v. *Long*, 76 Ill. 399; *Hoffman* v. *Hoffman*, 15 O. St. 427; *Williams* v. *Williams*, 13 Ind. 523; *Dubois* v. *Johnston*, 96 Ind. 6; *Wakefield* v. *Ives*, 35 Iowa 238.)

*Henry W. Heideman* and *G. H. Grubb*, for Respondent.

The doctrine that foreign judgments, or judgments of sister states, are always open to attack upon the question of jurisdiction, is too well settled to require more than a passing notice here. (*Thompson* v. *Whitman*, 18 Wall. 457–471; *Rose* v. *Himely*, 4 Cranch 241; *Elliott* v. *Piersol*, 1 Pet. 328; *Christmas* v. *Russell*, 5 Wall. 293; *Dunlap* v. *Cody*, 31 Iowa 260; *Luckenback* v. *Anderson*, 47 Pa. St. 123; *Jackson* v. *Jackson*, 1 Johns. 424; *Borden* v. *Fitch*, 15 Johns. 121; *Bu-*

*ford* v. *Buford*, 4 Munf. 241; *Davis* v. *Headley*, 22 N. J. Eq. 115.) But our contention is that such a judgment, in fixing the custody of the children is *res adjudicata* only of the questions passed on—that is, up to the time of the rendition of the judgment. (*State* v. *Bechdel*, 37 Minn. 360; Church on Habeas Corpus, page 576 and note; *In re Bort*, 37 Am. Rep. 255; *Kentzler* v. *Kentzler*, 28 Am. St. Rep. 21; *People ex rel Allen* v. *Allen*, 105 N. Y. 628; Church on Habeas Corpus, § 82.) And where a child has been removed from the jurisdiction of the court that has by decree fixed its custody, to another state, the courts of that state have jurisdiction to again fix the custody of the child, without regard to the former decree. The child having been lawfully brought into the new jurisdiction, becomes the ward of the court which has power to provide it with a proper guardian. (Cooley on Cons. Lim., page 499; Church on Habeas Corpus, § 82.)

BUCK, J.—The record in this proceeding is unnecessarily voluminous, and bristles with exceptions to the admission or refusal to admit testimony. Many of these exceptions, also, are of so frivolous a nature that they have been ignored, not only in the arguments and briefs of counsel, but in the specification of errors itself. A proceeding in *habeas corpus* is summary in its character, and we feel it our duty to vigorously condemn any unnecessary impeding of this, its essential function, by technical and hypercritical criticism in reference to the admission of any evidence tending to enlighten the trial court. This is true despite any distinction of procedure or testimony to be observed in the case of a writ obtained by a parent to test the right to the custody of his child, and one issued to decide whether the petitioner is illegally deprived of his liberty. Mr. Church in his work on Habeas Corpus (section 177) says : "It has been heretofore observed that proceedings by *habeas corpus* are summary in their character, and that great discretion is given to and exercised by courts and judges in such proceedings. Where the statute provides that courts and judges may ventilate the whole matter brought

before them by *habeas corpus*, the general principles of evidence are doubtless their rule and guide; but, they are not bound to so strict an adherence to them as govern them in trials by jury, because, in the words of that great judge, Tilghman, 'it is presumed that their knowledge of the law prevents their being carried away by the weight of testimony not strictly legal.' ''

Upon the objection that it was incompetent and immaterial, the lower court at first excluded the decree and judgment roll of the divorce granted in Arizona, and then, at a later stage of the trial, admitted them for the purpose of showing that a divorce had been granted between Joseph L. Giroux and Rebecca Giroux. The consistency of these rulings is not apparent to us, but respondent's counsel contend that this decree of divorce is void, and that the lower court found it to be so. An inspection of the judgment roll satisfies us that there is nothing on its face to indicate that the decree of divorce was void, and, the existence of the decree itself being denied,— even if it could be attacked on jurisdictional grounds by extrinsic evidence,—the exclusion was erroneous. But any error in this respect seems to have been cured by the subsequent admission of the decree and judgment roll, even though this admission was limited to merely showing that a divorce had been granted. The gist of the inquiry as to this decree is whether it is void, or only voidable. Mr. Freeman, in his work on Judgments (sections 562–564, 588–590), lays it down as a general proposition that, where an action is based on the judgment of a court of another state, the jurisdiction of that court to pronounce the judgment is always open to question, and that a defendant can controvert jurisdictional statements and recitals by any competent evidence, extrinsic or otherwise. Still, the scope of this jurisdictional inquiry is clearly limited, and Mr. Freeman, in the latter part of section 564, *supra*, clearly points this out. He says: "And ought not the defendant to be always permitted to prove that he was a nonresident, and that he did not submit himself to the jurisdiction of the state whence the record is taken? On the other

hand, if the defendant were a resident within the state when and where the record was made, the fact of his subsequent removal ought neither to impair nor to strengthen the obligation of the judgment. To whatsoever state he immigrated, the record, when produced against him, should have the effect which would be given it in like circumstances if he still resided in the state whence it was taken; and this, too, independent of the question whether it is positive, doubtful, or silent in reference to jurisdictional facts. It seems to us, then, that the only issue which ought to be tried in any state in regard to the jurisdiction of a court which has rendered a personal judgment in another state is, was the defendant, when the suit was instituted, within the state whose court assumed to exercise authority over him? or, if without the sta e, did he submit himself to its authority? If the issue should be answered in the negative, then the judgment ought to be disregarded, no matter how positively the record enumerates all needful jurisdictional facts. If, on the other hand, the issue be determined in the affirmative, then the record ought, upon jurisdictional as upon other questions, to have precisely 'the same faith and credit given it as it had by law or usage in the courts of the state whence it was taken.' "

The evidence in the record before us in no wise establishes the fact that this divorce was void. The Arizona clerk who issued the summons, the deputy sheriff who served it, and the relator, Joseph L. Giroux, all state most positively that there was no fraud in the service of the summons upon Mrs. Giroux. She herself, in her own testimony, virtually concedes that a summons was served on her personally while she was in Arizona. The evidence in the record, moreover, conclusively shows that at the time of this service she was a resident of Arizona. Nor does the fact that she departed from Arizona a few days prior to the rendition of the decree in any wise tend to establish the fact that she was a nonresident of that territory. Construing her testimony most favorably to herself, when she left Arizona she did so with no intent whatsoever to change her domicile and begin a permanent residence in Mon-

tana.    Even then, if her husband did perpetrate a fraud in
respect to the obtaining of this divorce, nevertheless the juris-
diction of the Arizona court pronouncing the decree against
her had clearly attached, by reason of this personal service of
its process upon her, and she was as much under the control
of that court as if she had remained in Arizona until the de-
cree had been pronounced.    Without passing upon the ques-
tion of whether or not the general rule as to collateral attack
is more stringent in a *habeas corpus* proceeding of this charac-
ter than in a suit on the judgment itself sought to be assailed,
we are of the opinion that, even allowing the widest latitude
to the doctrine that a judgment rendered in one state may be
attacked when sued upon in another in reference to its juris-
dictional statements and recitals by any competent evidence,
extrinsic or otherwise, this decree of divorce was voidable
only, and not void.    In the case of *Edgerton* v. *Edgerton,* 12
Mont. 122, 29 Pac. 966, the facts alleged in respect to the
fraud claimed to have been perpetrated by the husband in ref-
erence to the appearance of the wife are closely analogous to
the alleged facts relied upon by Mrs. Giroux in the present
suit.    It is true, the decree sought to be collaterally attacked
in *Edgerton* v. *Edgerton,* was a domestic judgment, and the
present subject of attack is a judgment of another state; but
the latter is voidable only, like the former, and, neither being
subject to collateral attack on the ground of fraud alleged to
have been perpetrated by the plaintiff in each in preventing
his wife from appearing at the trial, there is no distinction in
the status of the two decrees.    They stand on the same plane,
and the law as laid down in *Edgerton* v. *Edgerton* is clearly
applicable to this Arizona decree.    See, also, 2 Bishop on
Marriage, Divorce and Separation, § 1568.

It is claimed by counsel for respondent that the court be-
low found the agreement for separation invalid.    It was ad-
mitted in evidence over the objection of the respondent.    But
just what view the court took of this agreement the record
does not disclose.    In a case decided at the present term
(*Stubbens* v. *Morris,* 47 Pac. 642), we stated generally our

views of the law applicable to agreements for separation be-
tween a husband and wife, considered with reference to the
common law.    To the agreement before us is added a feature
which did not appear in the agreement for separation under
consideration in *Stebbins* v. *Morris*, namely, · a provision for
the custody of the issue of the marriage.    This new feature
does not materially affect the principles laid down in *Stebbins*
v. *Morris*, however.    The matter of the custodianship of
children is as proper a subject for provision in an agreement
for separation between the parents as the wife's maintenance,
or the division of property.    If the agreement for the separa-
tion itself is not *per se* void, neither are its naturally incidental
provisions.    We can readily understand that, in a direc⁀ pro-
ceeding to set aside the decree of divorce itself, such an agree-
ment might be considered void, from an evidentiary standpoint,
on the ground that it was collusively entered into for the pur-
pose of facilitating the divorce, or that, in a direct action ex-
clusively for its enforcement, a court of equity, fully apprised
of latent fraud connected with it, might declare it contrary to
public policy.    But in the case before us the validity of this
particular agreement should stand or fall with this decree it
preceded, and from which it would be difficult to separate it.

The record shows that the relator, Giroux, has paid over to
Rebecca Giroux the $4,300 he agreed to pay her, and that,
even in the decree of divorce he obtained, a provision for the
custody of his son alone was inserted, in strict compliance
with the terms of the agreement.    It inferentially appears,
also, that Mrs. Giroux now relies upon this money for the
maintenance of herself and the children.    Should she be al-
lowed, then, to assert a condition of financial responsibility so
acquired, to establish her right to the boy, George, and at the
same time object to any consideration of this very agreement
which she repudiates, in so far as her own covenants therein
are concerned ?    We think not.    As shedding light upon the
right to the custody of this child, the lower court properly
admitted the agreement in evidence; and, if it was subsequent-
ly ignored, error was committed.

Excluding from consideration any evidence as to the alleged fraud in obtaining the divorce from his wife, the charge against Joseph L. Giroux, that he is not a fit person for the custody of the boy, is wholly unsubstantiated. It appears from Rebecca Giroux's own testimony that he is a man of means, and has always been a kind father. The charge, too, that his second wife is not a proper person to aid him in the rearing of the boy, is also without apparent foundation. Even the somewhat strained objection that she cannot speak the English language disappears in the light of the evidence. In this view, all the evidence concerning respondent's good character since she has lived in Montana is immaterial. She is before us in this record in the attitude of a justly discarded wife,—of one divorced for violation of her marital obligations. Conceding that a father recreant to his paternal duties will not be upheld in any merely arbitrary assertion of his right to the custody of his child, as against a good and conscientious mother; conceding that a child is not a mere chattel, subject to the whim or caprice of either of its parents, and that even at common law, as construed at the present time, it has an identity of its own, which courts of justice recognize and protect whenever a necessity for such protection arises,—conceding all this, and how does it avail the respondent? It must be borne in mind that the tie between parent and child is one of the most binding in human life,—one which the law of nature itself has established. No legislation, no judicial interpretation of legislation, should lightly disregard the reciprocal duties of this relationship. Conflicts between parents themselves as to the custody of their offspring are always necessarily painful. But, in the adjustment of these conflicts, mere sentiment and involuntary sympathy have no place. The law, however stern it may seem to the losing party, must govern. In these cases the elementary principles of the sturdy old common law still apply, however modified they may be by legislation and judicial interpretation, and probably will until a higher development of our present civilization supersedes them. A father is the head of the family. Upon him pri-

marily devolves the responsibility for the support—physical, moral, and social—of his wife and children. If he is true to this duty and qualified to discharge it, he is entitled to the reciprocal allegiance of those whom he so sustains, and whom it is his duty to so sustain. Where a father and mother are equally fitted in character and ability for the custody of their children, and an unhappy conflict arises between them as to who shall have such custody, in the eye of the law the father's right is superior to the mother's, and the courts must maintain it. The bond between a mother and her babies may seem closer, from a mere instinctively emotional standpoint; but under the natural compact of our society and civilization, as at present developed, and from which this legal principle has been evolved, the relation of the father to his children is the higher, sociologically considered.

The greater part of the material evidence and testimony in this record is contained in depositions and written instruments. Consequently, in considering its weight and effect we are not seriously hampered by that element of verity imported to the verdict of a jury, and the findings of a court corresponding thereto, when the witnesses have testified *viva voce* at the trial. The oral testimony of the respondent herself was manifestly elusive, vague, and contradictory. There was hardly any corroboration of it. Opposed to her statement were clear and straightforward denials in the depositions of several witnesses whose credibility was in no wise impugned, and who presumptively told the truth. The letter which Mrs. Giroux wrote to Mrs. Murry (see statement) in reference to the separation almost of itself contradicts her allegations as to fraud and deceit practiced upon her. The deposition of the notary public who took her acknowledgement to the agreement of separation states that, without the hearing of her husband, he made her acquainted with its contents, and in this agreement is a clear and unequivocal reference to the pending divorce suit. In this view of the law and the evidence, we do not think the lower court was justified in rendering the judgment it did. We do not wish to be understood as holding that this

decree of divorce awarding the custody of the child to the father was of itself absolutely binding upon the lower court. Had proof been introduced showing that the father, since the decree, had become an unfit person for the custody of the boy, and that, as between the two parents, for the child's protection it would have been better to award the custody to the mother, the conditions would have been different. But no such condition of affairs was before the lower court. Had proper weight been attached to the decree of divorce, no doubt a different judgment would have been entered. The evidence shows conclusively that there is nothing in the contention of respondent's counsel that the wife and child were domiciled in Montana at the time the decree of divorce was obtained. We have clearly expressed our view as to the wife's domicile. The child's domicile was that of his father. If the pleadings had conceded the contrary, an amendment should have been allowed as of course to conform them to the proof.

Two other alleged errors are presented for our consideration. The following interrogatory was propounded to several witnesses whose depositions were taken, namely: "Which do you consider the better qualified to have the care and custody of their said minor child, George L. Giroux, now about seven years of age,—relator or respondent?" It was objected to as incompetent on the ground that it asked for a conclusion of the witnesses. We think the court was right in sustaining the objection. The question manifestly asked for a conclusion, and was therefore clearly incompetent. The following interrogatory was also propounded: "State whether you consider respondent a fit and proper person to have the care and custody of the said minor child, George L. Giroux, and give reason for your opinion." While this last interrogatory is less objectionable than the former, still the objection to it, that it asked for a conclusion, was properly sustained. The judgment is reversed, with costs. The cause is remanded, with directions to the lower court to render judgment in favor of the appellant for the custody of the child George L. Giroux.

*Reversed.*

PEMBERTON, C. J., and HUNT, J., concur.