## SIMPKINS *v.* SIMPKINS.

### Opinion delivered December 9, 1918.

1. DIVORCE—HABITUAL DRUNKENNESS—SUFFICIENCY OF EVIDENCE.—In a suit by a wife for divorce, evidence *held* to sustain the chancellor's finding that defendant was not an habitual drunkard.

2. DIVORCE—ADULTERY—SUFFICIENCY OF EVIDENCE.—In a wife's suit for divorce, proof that on two occasions an immoral instrument was found in the husband's pocket is insufficient to prove adultery on his part.

3. DIVORCE—INDIGNITIES.—The indignities offered which entitle one to a divorce under the statute must be habitual and systematically pursued to an extent which would render life intolerable.

4. DIVORCE—INDIGNITIES.—In a wife's suit for divorce, evidence *held* to sustain denial of divorce on ground of indignities.

5. DIVORCE—SEPARATION—ALIMONY.—In a wife's suit for divorce, alimony of $25 a month was properly awarded her, though her bill for divorce and a third interest in the husband's estate was dismissed where he consented to her separation.

Appeal from Crittenden Chancery Court; *Archer Wheatley,* Chancellor; affirmed.

*Brown & Anderson,* for appellant.

1. An absolute decree of divorce should have been granted with statutory alimony. All the grounds for divorce were sufficiently proved. 98 S. W. 975; Kirby's Digest, § 2684.

2. Habitual drunkenness was sufficiently shown. 147 S. W. 73; 38 Ark. 324.

3. Adultery was proved. 101 Ark. 522.

4. Indignities were proved sufficiently.

*Rudolph Isom,* for appellee.

1. The appeal should be dismissed. 109 Ark. 449; 160 S. W. 857; 53 Ark. 514. She accepted the benefits under the decree and can not appeal.

2. Habitual drunkenness was not proved. Kirby's Digest, § 2672, Art. 5; 9 Ark. 507; 147 S. W. 73; 38 Ark. 324.

3. Nor was adultery proved. 97 Ark. 127; 101 *Id.* 522; 83 *Id.* 533.

4. Indignities were not proved. 150 S. W. 1031; 105 Ark. 194; 76 *Id.* 28; 34 *Id.* 37; 76 *Id.* 28.

5. The chancellor's findings of fact should not be disturbed unless clearly against the weight of testimony. 101 Ark. 529; 67 *Id.* 200; 75 *Id.* 32; 41 *Id.* 292; 50 *Id.* 358; 44 *Id.* 216. See also 58 *Id.* 135; 63 *Id.* 513; 90 *Id.* 40; 101 *Id.* 510; 150 S. W. 112.

6. On the cross-appeal it was error to grant alimony as no ground of divorce was shown and a divorce denied. 17 Cyc. 767; 14 *Id.* 768.

HUMPHREYS, J. Appellant instituted suit against appellee on the 3rd day of January, 1918, in the Crittenden Chancery Court for an absolute divorce and one-

third of the personal estate of appellee, upon the following alleged grounds: (1) habitual drunkenness, (2) adultery, (3) indignities offered to her person that rendered her condition intolerable.

Appellee filed answer denying each material allegation in the complaint.

The cause was submitted upon the pleadings and depositions of the witnesses from which the chancellor found that the evidence was insufficient to sustain any of the charges, but was sufficient to allow some alimony. A decree was accordingly rendered dismissing the bill for divorce and awarding $25 per month as alimony. Appellant has prosecuted an appeal from the decree dismissing her bill for divorce and one-third interest in the estate of appellee; and appellee has prosecuted a crossbill from the decree awarding alimony in the sum of $25 a month. The cause is therefore properly before this court for trial *de novo.*

(1) There is some evidence tending to show that appellee was a drinker of liquor during the entire time appellee and appellant lived together as man and wife, but that he only occasionally drank to excess. Appellant's own testimony was to the effect that he got drunk occasionally. Appellee introduced a number of witnesses who associated with him in a business way and frequently met him, who testified that they never saw him take a drink and never saw him when he was under the influence of liquor. The evidence failed to show that appellee had a fixed habit of frequently and habitually getting drunk. The finding of the chancellor that appellee was not an habitual drunkard is sustained by the weight of the evidence, under the test laid down in the following cases, as to what it takes to constitute an habitual drunkard. *Rose* v. *Rose,* 9 Ark. 507; *Brown* v. *Brown,* 38 Ark. 324; *O'Kane* v. *O'Kane,* 103 Ark. 382.

(2) The only evidence tending to show that appellee had been guilty of adultery was that of appellant to the effect that she had found an immoral instrument

in his pocket on two occasions—once in May and once in October, 1917. On the last occasion she had called the cook, Martha Taylor, to witness the discovery. Martha Taylor corroborated her testimony as to finding the instrument in his pocket to some extent. The effect of appellee's testimony is to deny that he had such an instrument in his possession for he denies that he knew anything about the discovery of the instrument in his pocket or that he ever had a conversation with his wife about it as sworn to by her. In addition to his denial, he established by Dr. Barton that he was being ineffectively treated for impotency at the times it is claimed the instruments were found in his pocket. Again, the possession of such an instrument falls short of proving adultery. He may have procured it for the purpose yet never used it. No paramour or opportunity was shown. In the case of *Leonard* v. *Leonard,* 101 Ark. 522, this court approvingly quoted from 14 Cyc. as follows: "If an adulterous disposition on the part of defendant and the alleged paramour is shown, and it appears that there was an opportunity for them to commit the offense, these facts are sufficient to establish adultery. * * * To have this effect the opportunity must occur under incriminating circumstances." We do not think the mere possession of an immoral instrument necessarily established adultery on the part of the appellee. Especially would it not be so in the instant case, for the evidence strongly tends to show that appellee was impotent. The clear preponderance of the evidence is not against the finding of the chancellor on the charge of adultery.

(3) Appellee, at the age of 60, and appellant, at the age of 45, married in Memphis, Tennessee, on November 22, 1914. Appellant was a widow at the time and had a daughter, Ruby Hinds, about twelve years of age. Immediately after the marriage, they went with appellee to his home in Marion, Arkansas. Appellee was engaged in the mercantile business and had two stores, one in Marion, and one a short distance out in the country. Appellant assisted her husband in conducting the stores and

conducted a boarding house at the family residence in the same enclosure with the store. During the time she got her supplies from the store for use in the boarding house, no charge was made upon the books against her, but, during the years 1915 and 1916, she paid $782 on her husband's store indebtedness out of her bank account which she replenished from time to time with money received from her boarders. In February, 1917, her husband purchased a large dwelling house in the same enclosure, from E. C. Culver, for $1,800. Appellant fitted up and furnished the house and used it in connection with her boarding house business. After enlarging the boarding house business, she ceased to work in the store and attended entirely to her boarding house. The husband continued to conduct the mercantile business, and she conducted the boarding house business. The understanding was that she should have supplies from the store to run her boarding house at cost and carriage, and that, in lieu of rent, she should board appellee and his porter or clerk. She continued the boarding house business until the separation, and, until the last month, kept her own account of the goods she obtained from appellee's store and paid for them according to her account. About that time, appellee employed J. C. Harrison as a clerk, who concluded all the goods taken out of the store by appellant were not being accounted for, and feeling responsible for them, obtained permission from appellee to keep an account. Appellant concluded she was being overcharged by this clerk and became angry. The separation occurred October 22, 1917. She only had a small amount of household goods at the time she came; when she moved away, she had three van loads of goods, an automobile which had been purchased principally by appellee, and some bank account. There is a conflict between the evidence of appellant and appellee as to which one wanted to start the boarding house business, and as to the immediate cause of the separation.

The substance of the evidence, responsive to the charge of indignities offered, is as follows: Appellant

testified to some conduct, by word and act of appellee, calculated to render her condition intolerable; that appellee cursed her on a number of occasions; that he took her to task for going to a chatauqua at Earle with Mr. Martin and her daughter and remaining out until twelve o'clock at night; and quarreled with appellant and criticised her daughter because the daughter was permitted to go to church with Mr. Field, with whom she was only slightly acquainted; that appellee, on one occasion, charged appellant with wrongfully taking money out of the cash drawer; that appellee had permitted J. C. Harrison, his clerk, to say in his presence, without resenting it, that appellant had stolen some lard out of his store; that on Saturday before appellant left the house, she was invited to leave by appellee; that when she got to Memphis, she tried to call Mr. Simpkins from the Arlington Hotel, but the lines were busy and that she walked across the street and got Mr. Levish to send him a message that she was not going back. She was corroborated in her statements by her daughter, Ruby Hinds.

Martha Taylor, who cooked for appellant and appellee eight or nine months immediately before the separation, testified that she was in close contact with them while there; that she never heard Mr. Simpkins use any profane or abusive language to Mrs. Simpkins; that on no occasion had she ever heard Mr. Simpkins make a disparaging remark about Mrs. Simpkins; that they seemed to love each other; that Mrs. Simpkins and her daughter both had access to everything in the store.

Fred Caruthers, a porter around the store in 1916 and 1917, testified that he was with them about eleven months; that Mrs. Simpkins and her daughter had access to everything; that he never heard Mr. Simpkins use any abusive language toward Mrs. Simpkins; that his disposition was good and that they seemed to get on as nice as any one could; that he had never seen Mr. Simpkins angry but one time when he and his wife had a fuss about some coffee; that on that occasion Mr. Simpkins said that rather than have a dispute he would allow the wit-

ness to weigh the coffee and pay what she thought was right.

J. C. Harrison testified that he went to work for Mr. Simpkins October 1, 1917; that he felt responsible for what was being taken out of the store and suggested that he put down what was being taken out by Mrs. Simpkins and got permission from Mr. Simpkins to do so; that he informed Mr. Simpkins that his wife had stolen a bucket of lard, which she denied getting, and that Mr. Simpkins made no response concerning the charge; that Mrs. Simpkins was very angry because he was charging everything up to her; that during the time he was there, Mr. Simpkins' attitude and disposition towards Mrs. Simpkins was as nice as he ever saw; that he never heard him speak disrespectfully to his wife or daughter; that he was more like a father than a stepfather; that he never heard Mr. Simpkins use any abusive language to either one and that he was always kind and considerate to them.

H. S. Schweink testified that he took his meals at Mrs. Simpkins' boarding house for seven months in the year 1917; that he had never heard an unkind word out of Mr. Simpkins regarding his wife, and that he was exceptionally kind toward her daughter; that he never noticed any disagreement between Mr. and Mrs. Simpkins during the time he was there.

R. H. Jones, half-brother of appellant, who lived at Evadale, Arkansas, testified that his sister visited him on two occasions in 1917 and spent several days with him; that on the last occasion, her husband and Ruby came with her and remained over Sunday; that Ruby was thrown from a horse she was riding and her mother began fussing at her; that Ruby asked her stepfather to stop her mother from fussing with her; that the relationship between Ruby and her stepfather was quite affectionate; that appellant and appellee seemed to be getting along all right; that appellant never informed him on either visit of any mistreatment or misconduct on the part of appellee; that appellant told him she was in straightened financial circumstances before she married

appellee but that now she was making money out of the boarding house.

Appellee testified that he used some profane language in the presence of Mrs. Simpkins, but that it was in a general way and not directed at either her or her daughter; that he never cursed or abused his wife; that his wife had access to his store and money drawer at all times; that when his wife returned from the chatauqua about midnight he made some complaint and one word after another brought on a quarrel; that he made objection to Ruby going to church with Mr. Field on account of his being a stranger, but that he did not abuse her and had no recollection whatever of using profane language; that six or seven months before the separation, his wife got some money from an unknown place and paid a bill for him and that he then suspected for the first time that she was taking money, without his knowledge, out of the cash drawer, and he told her so; that, later, his clerk told him that his wife had stolen a bucket of lard out of the store and that he did not resent it; that on two occasions she said "I am feeding myself and feeding you, and I just as well be off somewhere else"; that he replied "If you feel that way about it, you can move tomorrow and I will move you"; that he never ordered his wife to move and did not know she was going; that the first he knew of her leaving, some one called him up from Memphis and told him his wife was not coming home.

The evidence is quite voluminous and it is impracticable to set it out in detail in this opinion, but the general trend of it is to the effect that, outside of a few isolated instances, appellee manifested a kindly disposition toward his wife and daughter. The evidence fails to show any settled hatred of appellant by appellee or that he habitually and systematically offered indignities to her person. The weight of the evidence shows that, outside of a few quarrels and disagreements, the family lived in harmony for three years. The most trying indignity offered by appellee was his charge that appellant

took money, without his consent, out of the cash drawer. While she cried at the time that indignity was offered her, she soon forgave him and they lived together six months thereafter. It has been settled by this court that the indignities offered, which entitle one to a divorce under the statute, must be habitual and systematically pursued to an extent which would render the life of the one, upon whom the indignities are imposed, intolerable. *Haley* v. *Haley*, 44 Ark. 429. Tested by this rule, the record in this case warranted the chancellor in denying a divorce to appellant under her charge of indignities.

It is insisted by appellee and cross-appellant that the court erred, under the record, in awarding appellant the sum of $25 per month as alimony. The contention is that, unless the evidence warranted the court in granting either an absolute divorce or a divorce from bed and board only, that it was improper to award alimony. Appellant is in error in this contention. This court said in the case of *Kientz* v. *Kientz*, 104 Ark. 381, that "It is the duty of the husband to support and maintain his wife, even though they may live separate and apart, if such separation does not result through her fault." It can not be said, in the light of the evidence in this case, that appellee's misconduct did not in part bring about the separation. The record in this case shows that appellant is absent from the home through the consent of appellee. The following question, propounded to appellee, and the answer thereto by him are found in the record:

"Q. You never told her she could leave or must leave?

"A. Well, now, I believe there was twice, there, Mr. Brown, she told me she was boarding herself and she said 'I am feeding myself and feeding you, and I just as well be off somewhere else,' and I said, 'Well if you feel that way it is perfectly all right, you can move tomorrow, or something like that, and I will move you.'" Pressed further, appellee said "Well, now, I think I told her that she intended to leave. I think I told her that. I think I said to her 'I know you intend to leave from what you

said yesterday,' I think that is as near as I can remember and I said, 'Whenever you get ready to move I am ready to pay the bill.' '' So it can not be said that appellant has absented herself from appellee without fault on his part. A husband who agrees to a separation, or so conducts himself that it is not congenial for him and his wife to live together, must, as a matter of necessity and right, maintain two households.

No error appearing, the decree of the chancellor is affirmed.