## Haley v. Haley.

| 44 | 429 |
|----|-----|
| 77 | 97 |

44      429
86      472

1. DIVORCE: *Custody of offspring: Permission of mother to visit.*
    In divorce cases where the custody of the offspring is given to the father, it is not necessarily erroneous for the decree to give leave to the mother, though immoral, to visit it. The courts should regard the maternal instinct of the veriest trull that walks the streets, taking proper care that it do not lead to the corruption of the child. It is the strongest and holiest sentiment of humanity; the freest from selfishness or impurity, and often the last hope for the redemption of fallen nature.

2. SAME: *Practice: Decree on bill and cross-bill.*
    Where there is a cross-bill in a suit for divorce, the decree granting the divorce ought to state on which bill it is granted, the original or cross-bill; but the omission to do so will not be reversible error.

3. DIVORCE: *Personal indignities.*
    The indignities to the person mentioned in the statute as the cause for divorce, need not consist of personal violence. They may be unmerited reproach, rudeness, contempt, studied neglect, open insult, and many other things habitually and systematically pursued to an extent which would render a woman's life intolerable. Nor is it necessary that she be wholly blameless.

APPEAL from *Garland* Circuit Court in Chancery.
Hon. J. B. Wood, Circuit Judge.

*G. W. Murphy* for appellant.

Reviews the evidence in detail, and contends that it does not establish the complaint.

A divorce will not be granted on grounds of ill treatment, where such treatment may be attributed to the misconduct or fault of the complaining party, or is not of such character, duration and frequency as to evince settled hatred, total loss of affection, and a fixed purpose of mistreating complainant. Nor is being drunk three or four times in as many years habitual drunkenness. *38 Ark., 119; Ib., 324; 33 Ib., 156.*

EAKIN, J. Mrs. Bridget Haley, the appellee, on the thirteenth of January, 1883, brought suit against her husband for a divorce, alleging, among other things, that he freely used towards her approbrious epithets; and was, and had been for years, in the habit of offering to her such personal indignities as rendered her condition intolerable; evincing discontent by sullen silence for days and weeks towards her, together with conduct specially set forth which, if true, would manifestly sustain the charge of rendering her situation as his wife intolerable. They have a child, a boy of about six years old. She prays for a divorce, the custody of the child, alimony, and general relief.

He answered, denying all the material charges, and filed a cross-complaint. He charges that on the thirteenth of October, 1881, she left his home without just cause, declaring that she would never live with him again. She remained away until September following, associating exclusively with persons whom she knew to be degraded and

Haley v. Haley.

immoral, subjecting him and herself to the most disagree-
able criticisms. She returned and staid with him a few
weeks, declaring, meanwhile, that she did not intend to
live with him again as man and wife; and then left again,
and has remained away ever since. That she has kept
clandestine correspondence with men of bad repute, and
meets them. That she is in every way untrue to him.

He states, further, that in 1881 he bought a lot in
Hot Springs, and took a deed in her name and built
a house upon it, intending it for their joint home. He
prays a divorce on his part, and a re-conveyance to him
of the land, the custody of the child, and general relief.

The cause was heard upon the pleadings, depositions of 1.Divorce:
the parties, and other witnesses. The Chancellor dissolved of child.
the bands of matrimony without indicating the grounds, mother to
or upon whose prayer the relief was granted, and decreed, visit.
further, that "each of said parties  *  *  *  be restored
to all property not disposed of at the commencement of the
action, which either of them obtained by, from or through
the other during said marriage, or in consideration or by
reason thereof." The custody of the child was left with
the father, subject to the right of the mother to make
weekly visits. The costs were decreed in favor of the
wife. The husband appealed.

Costs were in the discretion of the Chancellor. There
is no reason to infer from the transcript that this discre-
tion was abused. The appeal cannot be sustained on that
ground. The disposition of the child was in accordance
with the prayer of the cross-bill, and the privilege of vis-
iting accorded to the mother is a plain dictate of humanity,
in the absence of any reason to suppose that the privilege
would be abused to the injury of the boy. There was
none in this case. The charges of immorality against the
mother were not sustained. She is shown to be an indus-

trious, hard-working woman, and a good woman, by all the
witnesses except the defendant.   But had it been otherwise
the permission to visit would not be necessarily erroneous.
The courts should regard the maternal instinct in the
veriest trull that walks the streets, taking proper care that
it do not lead to the corruption of the offspring.   It is
the strongest and holiest sentiment of humanity; the freest
from selfishness or impurity, and often the last hope of
redemption for fallen natures.

The decree regarding the property is in the language of
our statute, and means that each party shall have back
any property which he or she may have conveyed to the
other during marriage and is not disposed of before suit.
The use of the word "restored" indicates that.   There is
no specific decree concerning the lot, fixing the title.   No
other property is involved.   The lot was bought by de-
fendant and the title taken to the wife.   The decree on
this point, so far as it fixes the rights of parties, is favor-
able to defendant.

2. PRAC-
TICE:
Decree on
bill and
cross-bill.
So far, there is nothing to sustain the appeal.   The ques-
tion arises whether either party, where there have been
cross-complaints and a prayer for divorce on both sides,
can appeal from a decree for a dissolution of the marriage
bond rendered on the merits.   If the decree had shown upon
its face that it had been in favor of the wife, there would be
little difficulty in holding that an appeal would lie by the
husband who had answered, and denied the allegations of
the complaint; although he had himself unsuccessfully filed
a cross-complaint asking a divorce on his part.   The prayer
in his cross-bill does not authorize a decree of divorce in
favor of complainant.   That would make it operate as a
consent, and it is peculiar to divorce cases that they can-
not be granted upon consent or by collusion.   If the cross-
bill be dismissed for want of merit, the defendant may

still reasonably claim to stand upon his answer to the original complaint, and resist the divorce wholly, and appeal from any error in granting it. It is, therefore, unnecessary in such case to notice the cross-complaint, which could only have the effect of consent, and that is not allowable. Or, upon the other hand, if the decree should show that the complaint was dismissed and the divorce granted on the cross-bill, then the complainant might for like reason appeal. It is well to remark, in passing, that in cases like this the decree itself should show the ruling of the court as to the complaint and cross-complaint.

Waiving the point of practice in this case, we have considered it well to adopt the views of counsel in treating it as a decree adverse to the wishes of defendant, rendered on the original complaint, and have looked into the merits.

The complainant proves good character, as we have said, by all the witnesses save her husband. If his assertions of her gross and open immorality were true, they are of such a nature as might have afforded the means of much corroborative evidence. There is absolutely none. We must presume his charges to be the delusions of a morbid jealousy. The evidence does not sustain a case of willful desertion on her part for the space of a year. It would have been proper for the decree to have dismissed the cross-bill as not sustained by proof.

Upon her complaint, the proof does not sustain the charge of habitual drunkenness, or of any cruel or barbarous treatment to endanger life, or anything in the nature of *saevitia* in the sense of the canonists. There were two or three cases of slight personal violence at rare intervals, very reprehensible and repugnant to more refined ideas, but not in themselves causes of divorce. The graver charge, that of such indignities to her person as to render her condition intolerable, is better supported.

28

Haley v. Haley.

These, it seems, sprung more from an inordinate jealousy than any settled dislike. He seems, notwithstanding all, to have been really attached to her. But he followed her up and watched her conduct, and not only in her presence but before others, made to and concerning her the grossest charges of lewdness. He denounced her as a liar and a thief, and sent her notes couched in language disgustingly obscene and abusive, making charges which even the coarsest woman must have found intolerable. These circumstances of life impelled her to seek employment away from home. He opposed this and resented it, attributing it to the motive suggested by his ungrounded suspicion. He constantly sought her at her places of employment, to take her away, and became an annoyance to others. She refused to return to him, declaring herself afraid, and that she had tried living with him until she despaired of doing so amicably. Upon the other hand, it is apparent that there never was a time when he would not have taken her back if she had come.

3. Personal indignities

Under the principles long ago established, in construing our statute, in *Rose v. Rose, 9 Ark.*, the indignities to the person therein mentioned need not consist of personal violence. They may consist of unmerited reproach, rudeness, contempt, studied neglect, open insult, and many other things, *habitually and systematically pursued*, to an extent which would render a woman's life intolerable. Nor is it necessary that the woman be wholly blameless. It is always a difficult and anxious point for a Chancellor to determine how far those things may go to render the woman's life intolerable. Much allowance is to be made for infirmities of temper and for indications of regret and repentance. Much consideration is due to the habits of the parties and their condition in life, and it is best that Chancellors should not give too serious an aspect to mere

passing quarrels or acts done under the irritation of the moment. Upon the other hand, it is the most refined of all cruelties to hold a woman for life subject to the subtle tortures which the marital state gives an opportunity of practicing in private, which may be concealed from the world by the false guise of courtesy and respect in the presence of others, and which may still produce a condition of heart misery to which death would be often preferable. No rule can be framed for the determination of such cases. Each must, of necessity, depend upon what can be brought to light, and how far it may indicate what lies concealed, and which even language cannot express.

Whilst the rule in *Rose v. Rose* is to be administered with caution, and not misapplied to transient quarrels or trifling and occasional injustices, which time and mutual forgiveness may cure, yet it expresses a true principle, founded on the highest considerations of humanity. Where it appears probable that no cure is to be expected, and that the evil will continue in its intolerable aspect, the happiness of a life is too sacred for sacrifice, although the subject may be an humble, hard working woman, without the refinements of education and culture.

It is for the Chancellor to judge of this. We think he might reasonably have concluded that the wife could not continue to endure the gross insults and charges which seem to have been wantonly blazoned to the world, without any proof to sustain them ; and might have reasonably thought that, without any sign on his part of contrition or retraction, no reform was to be hoped from one so little regardful of the future happiness of his innocent son as to persistently blacken the character of the mother in the indulgence of fits of resentful passion. The best woman might forgive that once or twice and try to forget it, but the coarsest woman could not endure it continuously.

Whatever our own opinions upon the merits of the case may be, we do not feel authorized to disturb the decree. We cannot say the Chancellor erred.

Affirm.