### LONG v. SMITH et al.

(Court of Civil Appeals of Texas. Amarillo. Dec. 6, 1913. Rehearing Denied Jan. 3, 1914.)

1. PARENT AND CHILD (§ 2*) — CUSTODY OF CHILDREN.

A husband was not bound by his wife's attempted deathbed disposition of his child to her parents.

[Ed. Note.—For other cases, see Parent and Child, Cent. Dig. §§ 4–32; Dec. Dig. § 2.*]

2. HABEAS CORPUS (§ 99*) — DISPOSITION OF CHILD.

While it is presumed that the best interest of the child demands that it be placed with its parents, such presumption may be rebutted.

[Ed. Note.—For other cases, see Habeas Corpus, Cent. Dig. § 84; Dec. Dig. § 99.*]

3. HABEAS CORPUS (§ 99*)—CUSTODY OF CHILDREN—JURISDICTION OF COURT.

Under Const. art. 5, § 8, giving general control over minors to district courts, such courts may dispose of the custody of a minor for its best interest, even by depriving the parents of such custody, though neither had relinquished their custody.

[Ed. Note.—For other cases, see Habeas Corpus, Cent. Dig. § 84; Dec. Dig. § 99.*]

4. HABEAS CORPUS (§ 99*) — CUSTODY OF CHILD—JURISDICTION OF COURT.

The district court, in the exercise of its chancery power, has jurisdiction to deprive the parents of the custody of a minor child, though they have not actually relinquished their custody.

[Ed. Note.—For other cases, see Habeas Corpus, Cent. Dig. § 84; Dec. Dig. § 99.*]

5. EVIDENCE (§ 472*) — OPINIONS — MATTERS DIRECTLY IN ISSUE.

A question to a witness in habeas corpus for a child, which, from his knowledge of the wife's parents and of the father and his mother with whom he was living, witness considered the better place for the child to be reared, was properly excluded; the answer sought being the question to be determined by the court.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2186–2195, 2248; Dec. Dig. § 472.*]

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexe

6. HABEAS CORPUS (§ 85*)—PROCEEDINGS FOR CUSTODY OF CHILD — ADMISSION OF EVIDENCE.

In habeas corpus by a father for the custody of his minor child from the maternal grandparents, evidence that the father was willing to abide by the decision of the arbitrators to make certain payments to his wife for the child's benefit would have been but of slight, if any, aid in determining the issues, and there was no error in excluding it.

[Ed. Note.—For other cases, see Habeas Corpus, Cent. Dig. §§ 77, 78; Dec. Dig. § 85.*]

7. TRIAL (§ 404*)—FINDINGS OF COURT—CONTRADICTION—DECLARATIONS OF JUDGE.

The findings of the trial judge cannot be contradicted or affected by oral declarations of the judge, though such declarations are embodied in a bill of exceptions in view of Rev. Civ. St. 1911, art. 1990, requiring the court to render judgment on the conclusions of fact found and separately stated, unless a new trial is granted.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 957–962; Dec. Dig. § 404.*]

8. HABEAS CORPUS (§ 99*) — CUSTODY OF CHILD—SUFFICIENCY OF EVIDENCE.

Evidence, in habeas corpus by a father for the custody of his minor child, the custody of which was claimed by maternal grandparents, *held* to show that the child's best interest would justify the award of its temporary custody to such grandparents with the right of visitation by the father.

[Ed. Note.—For other cases, see Habeas Corpus, Cent. Dig. § 84; Dec. Dig. § 99.*]

Appeal from District Court, Briscoe County; L. S. Kinder, Judge.

Habeas corpus by J. E. Long against S. B. Smith and others. From a judgment for defendants, relator appeals. Affirmed.

R. E. Green, of Tulia, and Geo. L. Mayfield, of Plainview, for appellant. Martin & Zimmermann, of Tulia, for appellees.

HENDRICKS, J. J. E. Long, the appellant in this court, and the father of Aline Long, a minor female child, of the age of about 22 months, at the time of the trial in the lower court, sought to recover the custody of said child by writ of habeas corpus from the appellees, S. B Smith and wife, the maternal grandparents, and, upon the hearing before the trial court, the temporary custody of the infant was awarded to the maternal grandparents, Smiths. The record discloses that, about five years prior to the trial of this case, J. E. Long, the appellant herein, was married to Audie Long, at which time he was only 16 years old and the wife was of the age of 26, and that some time during the year 1912 relator and his wife separated, which existed until the time of the death of the wife on January 28, 1913, at which time the mother just previous to her death requested of her parents, the respondents herein, that they retain the custody of her child, Aline Long, stating that J. E. Long, the father of the child, was unfit to have the care and custody of the same.

The trial court, after hearing the evidence, upon the request of the relator and appellant,

J. E. Long, filed the following conclusions of fact, which conclusions of fact we adopt as our conclusions in the disposition of this case:

### "Conclusions of Fact.

"I find that relator, J. E. Long, and Audie Long, the daughter of respondents herein, were married on the 26th day of August, 1908, and lived together as man and wife until about the 15th day of August, 1912; that there was born of their marriage one child, Aline Long, who is at this date about 23 months old and who is the subject of this controversy. This child was left in the custody of the respondents, who are its grandparents, on January 28, 1913; its mother requesting on her deathbed that respondents retain custody of the child and rear and educate it, the reasons assigned by her being that relator was unfit to do so.

"I further find at this date that the relator is not worth anything above his exemptions, and that he had no permanent home; that at this time he is working for his mother and brother at $25 per month and would have no home other than that of his mother to take the child in controversy if he were awarded its custody; and that there are in the house of his mother four children. I find that relator, J. E. Long, is at this time less than 22 years of age, not settled in life and possessing the habits and characteristics of the usual boy of his age. I find that, a short time prior to the fatal sickness of Audie Long, relator placed her in the home of her father, where she was to remain while he was absent from home cutting feed; that without any cause he loaded up her personal belongings and left them at her sister's the day after she was taken fatally sick; that before he had learned of her fatal sickness he notified the doctors that he would not be responsible for any accounts made by her; that he did not pay the expenses of her last sickness; that previously to this time he habitually cursed and abused her in the presence of her friends and the child in controversy, and other children, evidencing a total disregard of her feelings and showing a lack of responsibility and just appreciation of his duties as a husband and father; that, though assisted in some measure by both his mother and father-in-law, he has not accumulated anything since his marriage; that during the marriage relations, and some time previous to the separation, he cut his wife's dress with a knife and afterwards, in anger, threw a quart medicine bottle at her in the presence of her friends and family.

"I further find that the respondents are Christian people, upright and thrifty; that respondents have a good home and ample means to take care of the child in controversy and are attached to it, it having been in their home for some time previous to the death of its mother and having been nursed

by them through a serious spell of sickness after the death of its mother, from which it had just emerged; and that they are without other children to care for, except one other child.

"I find in conclusion that the facts brought out in the trial are such as to show relator to be lacking in a sense of responsibility and just appreciation of his duties as a father, and to be unable and unfit at this time to take care of an infant of tender years.

### "Conclusions of Law.

"I find, as a matter of law, that the best interests of the child, Aline Long, demand that it remain in the temporary custody of its grandparents, the respondents herein, until such time as the relator shows himself fit and able to rear and care for it."

We believe that the evidence in the case substantially sustains the findings of fact made by the trial court, and in addition we think the trial court could have found more explicitly and stronger the disposition of cruelty, although ten years younger than his wife, manifested by him towards her. The evidence indicates a development of tuberculosis by his wife quite a while prior to the time of her death; and of course, while there may be some extenuation on account of the youth of the husband, there are suggestions in this record of manifestations on his part towards her almost amounting to savagery, the following incident rather illustrating this disposition: "I did not kick her on the shin so that I made a big sore. * * * No, sir; that little sore was itching one time and she kinder scratching it and it would not quit itching, and I had a bone in my hand and I taken (it) and just rubbed it with that bone and it made it sore." His manifestations in regard to cutting his wife's dress are as follows: "We were over at Silverton at a show and when she came out of the show we were talking out a little ways out there and I said to her, 'Here you have got on this old dress that I never did like for you to wear;' and she says, 'Yes,' and I says, 'I have a very good notion to cut it off of you;' and she says, 'Take to it;' and I taken out my knife and taken to it. There was no row between us. It was just in fun. No one stopped me. I just got my play out and stopped. I cut that short place there" (which was about three inches in the neck of her dress).

Mrs. Mary Cook, a witness for the respondents, in regard to this incident, as far as her knowledge went, testified as follows: "The first part of August, 1909, I was at a medicine show here in Silverton with Mrs. Long and Mr. Smith and other members of the family. I heard Earl quarreling and cursing. His wife come to the wagon and told me that her dress was cut. She told it there in our presence. She did not show me the dress. That night she did not really say but she was worried and bothered and feeling bad about it." Another incident which is testified to by this witness in regard to the disposition of this relator we quote as follows: "As we passed the courthouse he rode up by the wagon and threw a quart medicine bottle at her. The bottle broke and spilled over everybody." There is an explanation by the relator himself that he merely rode by on his horse while the others were in the vehicle, stating to her that, "Here is your medicine," pitched into her lap the bottle, and it fell to the wagon bed and broke. This same witness, Mary Cook, testified that she was in Earl Long's home last August (1912) for about two weeks. "That was a little while before she took sick. He got mad once while I was there and cursed before me and my little girl, who will be four years old next July. He would get mad at something she would do that he didn't like. She was in bad health and scarcely able to be up at all while I was there."

[1] Of course the husband, Long, was not bound in any way on account of the attempted deathbed disposition of the child by its mother to her parents. Thereafter the only acquiescence that we are able to ascertain with reference to the possession by the maternal grandparents of this child is the statement made by him that on account of the condition of the weather and a spell of sickness of the child, at the home of the maternal grandparents, it being ill with pneumonia, he would not move the child from their home at that time; and we are confronted in this record by the proposition, although unassigned, and not discussed, whether or not, where there has not been a previous relinquishment of the custody of the child by the father to respondents, the court has the power upon writ of habeas corpus to perform any other judicial act, except to award the custody of the child to the father. In the case of Ex parte Robert Andrew Sams, 161 S. W. 388, decided by us November 15, 1913 (cause No. 487), the proposition was urgently insisted that, the evidence of relinquishment by the father in that case being lacking, it was the duty of the court, irrespective of any other consideration, to award the custody of the child to the father, without any further inquiry. We did not concede the legal proposition announced by appellant in that cause, but found the evidence to sustain a conclusion that the father had relinquished the custody of the infant child to the maternal grandparents, which, of course, devitalized the proposition as a purported legal principle, attempted to be asserted by the father in that cause. The writ of habeas corpus, used in this state as a form of procedure for the purpose of litigating questions as to the proper custody of infants, and inquiring

into their status to that end, is not really a procedure, when you sound the cases, calling in question an illegal restraint of children in the sense of a false imprisonment, by persons who may have their custody, though, of course, it may be used for that purpose, but is one of a development of the law on that subject, addressed to the equity powers of courts of chancery for the protection of the child's welfare; the change of custody, if made, following the ascertainment of this problem as a remedial right.

[2] Our courts have held the proposition that presumptively the best interests of the child is with the parent; but where conditions overcome this presumption, the infant's interest being the real issue, blended with the interests of society, this presumptive right of the parent is negatived and destroyed, and society and the government, as well as that of the child's interests, arise requiring a different custody.

[3] It is true, in so far as we are able to ascertain, where the aid of a statute does not assist the court, questions of this character have been litigated where one or both of the parents have relinquished the custody of the child to others, and the relative merits of these two opposing parties, as determining the child's welfare, are inquired into; but we take it that under section 8, art. 5, of the Constitution of this state, giving original jurisdiction and general control over minors to district courts, that such courts would have the power guarding the rights of all parties, where the right of the child and the interests of society would warrant it, to dispose of the custody of the minor child for its best interests, depriving either or both parents of that custody in such cases, though neither had, strictly speaking, relinquished their custody to the opposing party. A prior Legislature, by article 3502a of the Revised Statutes (prior to the revision of 1911), attempted to take this power from the district courts by enacting that on the petition of any citizen or citizens to the county judge, where he or they reside, setting forth that certain persons other than the natural guardians having in charge children under 12 years of age, to their injury, that said county judge may determine at a regular or called term the matter of such petition and by order of court rescue such children from the custody of such persons and place them in the custody of the person so petitioning, upon satisfactory proof that such change will benefit such children. The Supreme Court, in the case of Ex parte Reeves, 100 Tex. 617, 103 S. W. 478, decided that such a statute was void and that the Constitution intended to confer on the county courts only the matter of guardianship over the persons and estates of minor children, and that the equitable jurisdiction of courts of chancery, formerly exercised with reference to the custody of minors, was committed to the district courts. It

seems also that under the system of England, from the opinion of the Supreme Court, that courts of chancery, in addition to the jurisdiction to award the custody of the child according to its best interests, exercised jurisdiction to appoint guardians upon the estate and for the persons of minors, which with us is now committed by our Constitution to probate courts. Justice Gaines, quoting from Pomeroy, vol. 3 (3d Ed.) § 1303, says: "In addition to its power to appoint guardians (now in our county court), the court of equity will also exercise its jurisdiction, in a proper case, and to promote the highest welfare of the infant, where there is already a guardian, natural or legal, by controlling the person of the infant, and by removing it personally from the custody of its natural or legal guardian, even from the custody of its own parent." And our court further says that "this latter jurisdiction may be lawfully exercised by the district courts of this state is held in Legate v. Legate, 87 Tex. 248, 28 S. W. 281, and in other cases which need not be cited."

[4] If at last the real interests of the child is what a court of chancery is searching after (and infants were previously wards in chancery), it is unreasonable and inequitable to say that the Ultima Thule of its jurisdiction is bounded by cases where the parent has relinquished the custody of the infant.

It cannot be said in this case that the custody of the maternal grandparents is an illegal custody in the sense of an illegal restraint, based upon trespass or wrong interdicted by law; of course in a sense it would be improper possession, if it is to the best interest of the child to take the custody away from them, but should not be a reason to confront a district judge in the exercise of its chancery power debarring him from inquiring into that problem and compelling arbitrarily a restitution to the complaining parent, irrespective of any consideration as to the welfare of the infant and the moral or other unfitness of the parent. As stated, the state and society follow the real interests of the child, and, having a profound interest in an inquiry of this character, a technical rule tending to a destruction of such an important question might in some cases become disastrous to the child and inimical to society.

[5] Appellant assigns error that the trial court erred in refusing to allow certain witnesses to answer the following question: "From your knowledge of S. B. Smith and his wife and your knowledge of Earl Long and his mother with whom he is living, both from a financial standpoint and a moral standpoint, and from the general reputation of these parties, which, in your opinion, do you consider the better place for the child in controversy to be reared, in the home of Mrs. Long, where Earl Long is living, or in the home of S. B. Smith and his wife?" announc-

ing as a proposition that, "Whenever the condition of things is such that it cannot be reproduced and made palpable in the concrete to the court, then the witness may describe it by its effect upon his mind, even though such effect be an *opinion*," quoting numerous authorities, which upon investigation we think are entirely inapplicable and inappropriate to the condition indicated. The judgment and opinion of these witnesses attempted to be proffered by the appellant is the very question to be decided by the court, and the abstract nature of appellant's proposition is in itself to a certain extent a refutation of its correctness as a legal principle. A question of this kind would compound so many elements affecting the surroundings, as well as the qualifications of these people, morally, mentally, physically, and otherwise, that we believe it would inject an anomaly into the law to permit such conclusions to go to a court or jury, and no authority, according to our views, is presented, neither can we find any.

[6] The testimony of G. B. Mayfield, raised under the second assignment of error, which would have been to the effect that appellant Long was willing to abide by the decision of two arbitrators to make certain payments to his wife and for the benefit of his child, and which was rejected by the court, would have been very little aid, if any, to the court in deciding the respective merits of these contending interests, as well as the interests of the infant. The record presents that Long could not have been bound by the arbitration, according to the articles of arbitration introduced in evidence, and was a matter decided by the arbitrators on account of the dispute between his wife and himself before her death and would very remotely, if at all, touch the real question at issue here.

[7] The relator and appellant challenges the findings of fact and conclusions of law in this case on the ground that the oral statements made by the district judge at the time of his rendition of judgment were not in accordance with said conclusions of fact afterwards prepared and filed by him, as a part of the record of the case; appellant taking a bill of exceptions, embodying certain purported language of the court as to his conclusions at that time, which the court says he had no recollection of making and states in his modification of the bill, according to his best recollection, the expressions he did make at that particular time, all of which we think entirely inappropriate in this record, as the oral declarations of the judge of a court of record are not to be considered by us as an exposition of the real record in the cause, made in accordance with the statute. We are bound by the presumption that the rendition of the court's judgment, where a case is tried without the assistance of a jury and conclusions of fact are filed, whether before or after such a judgment, that the entering of the judgment was based upon such conclusions of fact and not upon ex cathedra statements, even if made at a time when the judgment is rendered. Article 1990, Rev. Stat. 1911.

The appellant and relator assigns error that the judgment of the court is contrary to the law and unsupported by the evidence in that the court found no positive moral disqualification of the father which would disqualify him for the custody of his child. We think a perusal of the conclusions of fact of the district judge is a sufficient refutation of this assignment. In accordance with our opinion in the case of Ex parte Robert Andrew Sams, decided at this term November 15, 1913, we held there and repeat here that, if it were not for the injection in the cause of the proffer of a home by the paternal grandmother, there could be no question, when you consider the age of the father in this case, not 21 years old at the time of the trial, and the infancy and helplessness of the child, about 22 months old, that the father, as compared with the maternal grandparents, when you consider the best interests of the child, would not be its proper custodian. Upon a divorce proceeding between the father and its mother, unless strong moral disqualification upon the part of the mother was shown, there would be no question but what a trial judge would award the custody of the child to its mother. Of course her rights would be stronger than the maternal grandparents since her death; but when we consider the acts of this husband, although a boy, suggestive of irresponsibility and misconception of proper conduct in the presence of others, and cruel manifestations towards his wife, they indicate a lack of developed moral sensibility and negative his fitness for the superintendence and control of the custody of this little girl at the present time, which would be the case if awarded her possession, notwithstanding his mother is assisting him in offering a home; and we think the custody should have been awarded to the maternal grandparents, who nursed the child through a severe spell of pneumonia immediately upon the decease of their daughter, its mother. The appellant claims that in a discussion he had with certain people, residents of Silverton, before the institution of this suit, with reference to the custody of this child, he informed them he would take it to his mother; others claimed that he said he would not take it to his mother. It seems that, though according to his statement he is getting along very well with his mother, he had a dispute with her and his brothers in regard to 160 acres of land which he claims to have inherited from his father and which his mother seems to concede. Differences, however, very apparent in this record, have existed between the mother and the other children and this particular relator, but just what those differences were is not shown. Long says: "There was a little hard feeling. I have not got the

land yet but I know I will get it." It is a matter of common knowledge that the division and distribution of inheritable property is often the cause of the most embittered feelings in families, and at the time of the trial there was no positive evidence that this matter had been definitely settled as to division.

At the time of the trial this relator was working for his mother and older brother for $25 per month, and it is speculative entirely, when you consider his disposition, what the immediate future of this baby girl would be if placed in the home of its paternal grandmother, if an estrangement should occur between the mother and son, and upon a change of headquarters change the environment of the child. It seems that when a mere boy, 15 years of age, he left his mother's home for the home of others and had lived with the Smiths some eight or nine months prior to the marriage with their daughter, and which the father claims was done without his knowledge. Just why he left his parent's home is not shown; and when you consider a boy of that age and the amount of land controlled and owned by the mother and the comfort of his mother's home, and the environment such a home should have afforded, whichever way you view it, and however much you may conjecture, is a circumstance in this record sustaining the judgment of the trial court. The mother of Long, on the witness stand, says that she promised him that as long as she lived she would keep the child for him and support it "if it was necessary." And further says: "I would support him and the child if necessary. * * * I did not think I would have it to do. I think that he is industrious enough to do it himself." It is rather hard to understand just what the mother means with reference to this matter, though we do not undertake to say that she would not, if the necessitous condition arose, protect and nurture the child. The maternal grandparent, however, says: "After the mother's death, the child had pneumonia and me and my wife nursed it. I think I am able to and am willing to take the child and rear it and educate it and I will do it. I am anxious to do it and school it well." The respondents have only one other child at home, a little girl, nine years of age, all the others having married and departed; and the paternal grandmother has three others, a young man older than the relator, Long, a young lady, 19 years of age, and another boy 14 years of age. She seems to be possessed of more property than the Smiths but demands upon her at her home are also greater.

[8] Following in the main the Sams Case, decided by us at this term, we think the judgment of the trial court, awarding only the temporary custody of the child to the maternal grandparents, with the right of visitation by the father at all times, which, if interfered with by the Smiths, constitutes a contempt of court, is correct and should be affirmed.

We have attempted to carefully consider all assignments and propositions not discussed by us, which we overrule. Affirmed.