[Sac. No. 5687. In Bank. Feb. 15, 1946.]

ROSEMARY MUNSON, Appellant, v. WALTER C. MUNSON, Respondent.

Blaine McGowan for Appellant.

Chester Monette for Respondent.

SCHAUER, J.—From an order which modifies a decree of annulment of marriage to award custody of the minor child of the parties to defendant father, plaintiff mother appeals. She urges that the trial court's action in changing custody from the mother to the father was an abuse of discretion. Plaintiff's argument is based upon her view of the sharply conflicting evidence. We have concluded that the order of the trial judge, who saw and heard the witnesses, including the parties, and found upon sufficient evidence that it was for the best interest of the child that custody be awarded to the defendant, cannot be disturbed.

The parties intermarried on November 6, 1941. On March

31, 1944, the marriage was annulled on the ground that defendant, unknown to plaintiff, had another wife living at the time of his marriage to plaintiff, he apparently having procured an interlocutory, but not a final, decree of divorce. The decree of annulment awarded custody of the minor child of the parties (a boy then 20 months of age) to plaintiff mother and provided that defendant "may visit with said minor child at all reasonable times and places." The terms of the order at the time it was made were in accordance with the provisions of an agreement of the parties dated March 15, 1944, and filed with the decree. Such agreement, however, required the plaintiff, within thirty days, to remove from her then place of residence and enter or establish a suitable and proper home for herself and the minor child. Defendant did not appear and was not represented by counsel in the annulment proceedings.

On May 18, 1944, defendant filed his petition to modify the annulment decree to award custody of the child to him. Plaintiff had not changed her place of residence. The modification was sought on the ground that the best interest and welfare of the child would be subserved by it and the petition was based both on the proposition that plaintiff was maintaining the child in an unfit residence and on the proposition that plaintiff was not a fit or proper person to have control of him. After hearing the conflicting evidence the trial judge (the same judge who made the original decree) filed a memorandum opinion in which he found that the home wherein plaintiff and the minor child resided "is orderly, neat, clean, and well-kept," stated that "The issue in a case such as this is not the condition of the home, but it is the fitness of the parents to supervise the care, custody, and control of the child, and what is for the best interest of the child" (see *Prouty* v. *Prouty* (1940), 16 Cal.2d 190, 195 [105 P.2d 295] ; Civ. Code, §§ 84, 138, subd. (1)), and found "that the defendant is better fitted to exercise that duty, and it appears that the best interest of the child will be served if he is awarded to the custody of defendant."

Plaintiff and the minor child lived in the five-room home of plaintiff's mother. The room which plaintiff and the minor child occupied was small ("six by eight" according to defendant's testimony) with two small windows, one of which could not be opened. Also residing in the house were plain-

tiff's mother, her brother and sister-in-law, and the latters' three-year-old child. Plaintiff received $30 a month from defendant for the support of the child. On about April 10, 1944, she obtained employment at $108 a month. Her sister-in-law cared for the child when plaintiff was at work.

Defendant testified that since the annulment he had seen five black and blue marks across his son's body and that on April 17, 1944, plaintiff's mother, in the presence of plaintiff, told defendant "about her [plaintiff] being out of humor and probably tired and wore out and she had to pull her off from beating the baby." Plaintiff testified that she had never whipped the child "to hurt him or make marks" and had never had to be restrained from beating him. Plaintiff's mother testified that she had never seen the child black and blue from a beating; that "I seen him have marks on him where he tipped a chair on him one day while his father was there. . . . I never had to restrain her [plaintiff] from beating [the baby]. I did interfere when I thought she spanked him too hard . . . with her hand." Introduced in evidence by defendant without objection was a wooden paddle which defendant testified he had seen "used dozens of times" by plaintiff and her sister-in-law to spank the child. Both plaintiff and her sister-in-law testified that they believed in the propriety and effectiveness of such discipline. The paddle was the property of plaintiff's sister-in-law and was taken by defendant without her permission.

Defendant testified that since the granting of the annulment he had seen his wife under the influence of liquor "several times . . . once or twice a week, on an average." Defendant had occasion to observe plaintiff come home after work "pretty well intoxicated" because he was at plaintiff's home five or six evenings each week to visit the baby. Plaintiff's mother and two neighbors testified that they had never seen plaintiff intoxicated. Plaintiff's sister-in-law testified that she had never seen plaintiff intoxicated in the presence of the minor child. Plaintiff was asked, "Have you been intoxicated in the presence of your minor child?" and answered, "Not that I know of." She was asked whether she drank "so that you become intoxicated at times," and answered, "No, it all depends on what you call drunk. If it is passing out, I have never been that way. I have been feeling good."

Defendant testified that at the time the annulment decree was entered he did not know, but later learned, that plaintiff

was having "an affair" with a man called Tippie and "If I had known this at the time [the annulment was granted] I would have naturally fought for the baby"; that defendant knew of his own knowledge that Tippie "has had several cases of trouble with other married women. . . . The man worked for us, I known him—my dad and I bailed him out of jail twice. He has a baby of his own and usually every three or four months gets in jail for nonsupport." On the evening of the 25th of April, 1944, defendant testified, plaintiff told him that Tippie "was over at the house and would like to see me, if I had guts enough to come over . . . with her, he would like to tell me that he had—hadn't had unchaste relations with her, and so I did." At 12:45 that night, defendant testified, he saw Tippie crawl through the window into plaintiff's bedroom where, as stated, the minor child also slept. Plaintiff testified that no man had ever crawled through the window of her room. According to the testimony of plaintiff, her mother and sister-in-law, it would be difficult if not impossible for a man to crawl through this window. In evidence, however, was a letter (which defendant found open in and took from plaintiff's home) dated May 6, 1944, to Tippie, written but not mailed by plaintiff, reading in part, "If I really thought there was any chance of you coming down, hon, I'd not only have my window made bigger, but I'd even move out in the yard and pitch a tent, then I'd be sure you'd get in." Plaintiff testified on cross-examination that the reference to the window was "just a gag. . . . He had been kidding about he would come down and crawl in my window." The letter continues, "Well, daddy darling, here it is 10 o'clock and I just got home from work. That is, I left at six but Mrs. Eller picked Ina and I up and we stopped in at her place for just one shot and it didn't end at that. I did feel pretty high for a while, but don't think I'll feel so good tomorrow." Plaintiff testified on cross-examination that she drank four highballs on this occasion.

Plaintiff properly does not contend in her briefs that the above mentioned letter was erroneously admitted in evidence but nevertheless, since the matter has been suggested in discussions in this court, consideration has been given to it. When the letter was offered plaintiff's counsel objected to it on the ground that it was "incompetent, irrelevant and immaterial. . . . The letter is the property of some person and I think before it can be used in a proceeding of this sort

*it at least ought to be explained how and why he [defendant]
came into the possession of it."* (Italics added.) The objection was overruled and on cross-examination defendant explained that while visiting his son he found the letter "laying on the table in the front room in her [plaintiff's] place, residence . . . laying there unsealed, unmailed" and that he took it and several letters of his own without asking permission of anyone. (After such explanation no motion to strike the letter was interposed.) The letter was properly admitted. ■ The general rule in California is that "where competent evidence is produced on a trial the courts will not stop to inquire or investigate the source from whence it comes or the means by which it was obtained." (*People* v. *Mayen* (1922), 188 Cal. 237, 243 [205 P. 435, 24 A.L.R. 1383]; *Herrscher* v. *State Bar* (1935), 4 Cal.2d 399, 412 [49 P.2d 832]; *People* v. *Peak* (1944), 66 Cal.App.2d 894, 904-905 [153 P.2d 464].) "The question of the admissibility of evidence wrongfully obtained usually arises in criminal cases. . . . But the use of evidence wrongfully or illegally obtained is not confined to criminal cases and no distinction has ever been made in this respect between civil actions and prosecutions for crime." (20 Am.Jur. 354, § 393.) The case of *Kohn* v. *Superior Court* (1936), 12 Cal.App.2d 459 [55 P.2d 1186], which has been suggested as recognizing a different rule, was a prohibition proceeding arising out of a replevin action and in making its ruling the court carefully pointed out that (p. 463) "the very issue before the court was whether the documents in suit had been wrongfully taken from this plaintiff." The ruling and discussion in that case have no pertinence to any question in the case at bar. Even if, as to the admissibility of such evidence, a distinction between purely private right actions and those in which a public interest is involved were proper, the public interest rule should prevail here. This is not a mere adversary proceeding between plaintiff and defendant. On the contrary the controlling rights are those of the minor child and of the state in the child's welfare, and the trial court properly so held.

■ It has also been suggested that certain opinion evidence, given by witnesses who were acquainted with defendant, to the effect that he was a good father and a fit and proper person to have the custody of his son, was "entitled to no consideration." Regardless of the weight to which such testimony was entitled no prejudicial error in its receipt is shown. Both plaintiff and defendant, severally (without

objection from the other except in one instance), adduced such evidence from various witnesses in support of their respective claims to fitness. The testimonies of the witnesses who stated opinions largely concerned observation by the witnesses of the conduct and character manifestations of the parties and to that extent was certainly not improper. As to one question addressed to one witness for defendant, which question called for the witness' opinion as to defendant's fitness to "raise his son," plaintiff objected on the ground that the question was "incompetent, irrelevant and immaterial and no proper foundation has been laid." So far as foundation for the question is concerned the witness had testified that she had known the defendant for fourteen years and that he roomed in the home of her husband and herself. Even if we assume that the opinion asked for was incompetent there was no prejudicial error as three other witnesses were permitted to give testimony to the same effect without objection. Furthermore, it may be noted that plaintiff's mother, who was a witness for plaintiff, on cross-examination testified that defendant was "greatly concerned about the welfare of his child"; that "I guess he is a good father, all right, as far as feeding and loving and things like that go."

Defendant testified that he roomed and boarded with Mr. and Mrs. Granberg (Mrs. Granberg is the witness above mentioned who was permitted over objection to give her opinion as to defendant's fitness to raise his son), who have two daughters, aged about 11 and 15; that if he was awarded custody of his son he intended to take him into the Granberg home; that "Mrs. Granberg is very willing to be a mother to him, when I am not there." Mrs. Granberg testified to the same effect.

The evidence as to defendant's conduct, like that above summarized as to the conduct of plaintiff, is sharply conflicting. Except for the admitted taking of the letter and paddle which defendant introduced in evidence, the testimony as to conduct of defendant which, plaintiff asserts, indicates his unfitness to have custody of the minor child, relates to occasions prior to the annulment. Even if all testimony as to defendant's past misconduct was believed, nevertheless "The question as to whether a parent is a fit or proper person to have the custody of a minor child refers . . . to his or her fitness at the time of the hearing and is not necessarily controlled by conduct . . . prior thereto. [Citations.]"

(*Prouty* v. *Prouty* (1940), *supra*, 16 Cal.2d 190, 194 [105 P.2d 295].)

■ Plaintiff relies on the proposition that, as between parents adversely claiming custody, "other things being equal, if the child is of tender years, it should be given to the mother." (Civ. Code, § 138, which refers to actions for divorce; the proposition is equally applicable here.) The evidence above recited is clearly sufficient to support the determination of the trial court that "other things" are not equal in this case. "In determining whether other things are equal within the meaning of the above code section, the trial court is necessarily allowed a wide latitude in the exercise of its discretion. In the first instance it is for the trial court to determine, after considering all the evidence, how the best interests of the child will be subserved. The question is to be determined solely from the standpoint of the child, and the feelings and desires of the contesting parties are not to be considered, except in so far as they affect the best interests of the child." (*Taber* v. *Taber* (1930), 209 Cal. 755, 756 [290 P. 36].) ■ It is settled that "An application for a modification of an award of custody is addressed to the sound legal discretion of the trial court, and its discretion will not be disturbed on appeal unless the record presents a clear case of an abuse of that discretion. [Citations.]" (*Foster* v. *Foster* (1937), 8 Cal.2d 719, 730 [68 P.2d 719].)

This court has recognized (*Foster* v. *Foster, supra,* at pp. 726, 728 of 8 Cal.2d) that generally "until some change of circumstances arises which makes a modification of the former order of custody advisable from the point of view of the welfare of the child, the court will give effect to the former order and will refuse to make any modification of such order," but that there may be cases "in which, despite the fact that there was apparently no change of circumstances, nevertheless, the welfare of the child might require that the previous order of custody be changed" (citing *Bogardus* v. *Bogardus* (1929), 102 Cal.App. 503, 506 [283 P. 127]), or "in which some fact, secret and hidden at the time of the entry of the former judgment, would in the interest of the welfare of the child, justify a court in modifying the former order of custody despite the fact that there had been no actual change of circumstances since the entry of the former order" (citing *Olson* v. *Olson* (1928), 95 Cal.App. 594, 597 [272 P. 1113]; *Titcomb* v. *Superior Court* (1934), 220 Cal. 34, 39 [29 P.2d 206]). ■ The above epitomized evidence is clearly suffi-

cient to support findings both that circumstances had changed and that facts material to the welfare of the child were "secret and hidden" from defendant at the time the original decree was entered. Under such circumstances there is no tenable basis for a court of appellate function to hold that the trial court abused its discretion in ordering the change of custody.

The trial court ordered "That the full care, custody and control of the minor child . . . be and he is hereby awarded to defendant." Defendant now suggests that the order be modified to permit "the mother to visit the child at all reasonable times and places, provided that she is not under the influence of intoxicating liquor." The question of plaintiff's right of visitation was not mentioned at the hearing and plaintiff has confined her argument to urging that the order be reversed. Defendant's suggested modification of this present award of custody is therefore a matter not within the province of this court on the record before us.

For the reasons above stated the order appealed from is affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Traynor, J., and Spence, J., concurred.

CARTER, J.—I dissent. The appeal in this case was first heard by the District Court of Appeal, Third Appellate District, and the majority opinion was prepared by Presiding Justice Adams and Associate Justice Peek concurred therein. This opinion contains a full and fair statement of the facts and correctly applies the rules of law applicable thereto. I therefore adopt the same as my dissenting opinion:

"This is an appeal from an order modifying a decree of annulment of the marriage between plaintiff and defendant, and changing the custody of the child of the parties from the mother to the father.

"The evidence shows that plaintiff and defendant intermarried November 6, 1941; that at that time defendant had another wife living from whom he was not divorced, though this fact was unknown to plaintiff. The latter subsequently filed an action to annul said marriage. Defendant made no appearance, and on March 31, 1944, a decree of annulment was made and entered, said decree also providing that the minor child of the parties, then aged twenty months, be awarded

to plaintiff, defendant being granted the right to visit said child at all reasonable times and places, defendant to pay plaintiff the sum of $30 per month for the support of such child. The provisions regarding the child's custody conformed to an agreement entered into between the parties settling such property rights as they had and providing that plaintiff should have the custody of her child. Less than two months later, on May 18, 1944, defendant filed a petition to modify the annulment decree to provide that the full care, custody and control of the child be awarded to him. The grounds alleged in the petition were that:

" '1. Plaintiff is not a fit and proper person to have control of said minor, in that since the granting of said decree she has become intoxicated at least twice a week in the presence of said minor; that she permits a certain man to come through the window of the house where she maintains said minor to visit her in her bedroom.

" '2. That plaintiff is maintaining said minor child in a residence that is not a fit and proper place of residence for the best interests and welfare of said minor in direct violation of her written separation agreement which defendant incorporates and makes a part of this Petition as if fully set out herein.'

"Plaintiff answered said petition denying the allegations thereof. The matter came on for hearing on May 24, 1944, and on June 27, 1944, the trial court filed a memorandum of opinion in which it stated:

" 'There is considerable testimony on the condition of the home in which plaintiff and the child reside; but, from all the evidence and the report of the Probation Officer, the said home is orderly, neat, clean, and well-kept.

" 'The issue in a case such as this is not the condition of the home, but it is the fitness of the parents to supervise the care, custody, and control of the child, and what is for the best interest of the child. On this subject it appears that the defendant is better fitted to exercise that duty, and it appears that the best interest of the child will be served if he is awarded to the custody of defendant.'

"The court made no finding that the mother was unfit, but made an order modifying the prior decree and awarding the 'full care, custody and control' of the child to the father, and made no provision for the mother to even see her infant. From this order the present appeal has been taken, it being

contended by appellant that the trial court abused its discretion in awarding the child to the father.

"Before considering the evidence let us consider certain principles of law applicable to such a case. Section 138 of the Civil Code provides that in actions for divorce the court may, during the minority of the children of a marriage, make such order for their custody, care, education, maintenance and support as may seem necessary or proper, and may at any time modify or vacate the same; that in awarding custody the court is to be guided by what appears to be for the best interest of the child in respect to its temporal and its mental and moral welfare; but that as between parents claiming custody, neither parent is entitled to it as of right, *but other things being equal, if the child is of tender years, it should be given to the mother.*

"Section 84 of the Civil Code also provides that in an annulment proceeding the court may make such order for the custody, care, education, maintenance and support of the children of the marriage, except that it *must* award the custody of the children of a marriage annulled on the ground of fraud or force to the innocent parent.

"It is well established that the determination as to which parent shall have the custody of a minor child is a matter resting in the sound discretion of the trial court and that its decision will not be reversed on appeal except where there is a clear abuse of such discretion. However, the discretion exercised must be a judicial discretion, and where custody has once been awarded and a change is sought, a change of circumstances must be shown, the burden of showing which is upon the moving party; and all presumptions are in favor of the reasonableness of the original decree. (*Prouty* v. *Prouty,* 16 Cal.2d 190, 193 [105 P.2d 295]; *Foster* v. *Foster,* 8 Cal.2d 719, 726-727 [68 P.2d 719]; *Olson* v. *Olson,* 95 Cal.App. 594, 597 [272 P. 1113]; *Gavel* v. *Gavel,* 123 Cal.App. 589 [11 P.2d 654]; *Moon* v. *Moon,* 62 Cal.App.2d 185 [144 P.2d 596]; *Washburn* v. *Washburn,* 49 Cal.App.2d 581, 587 [122 P.2d 96]; *In re Inman,* 32 Cal.App.2d 130, 134 [89 P.2d 421].)

"In *Moon* v. *Moon, supra,* the court said, pages 186-187:
" 'Undoubtedly the trial court had authority to change its order respecting the custody of Charla (Civ. Code, sec. 138). Because of her tender years, "other things being

equal'' she should be in the custody of the plaintiff, her mother. (Civ. Code, sec. 138.) The court having originally determined that she should be in her mother's custody, some change in conditions or some unusual circumstance had to be shown to justify an alteration of that provision. (*Foster* v. *Foster* (1937), 8 Cal.2d 719, 726 [68 P.2d 719]; *Washburn* v. *Washburn* (1942),49 Cal.App.2d 581, 587 [122 P.2d 96].) One who seeks a modification of an existing custody order has the burden of proving that conditions have so changed that a modification is justified. (*Prouty* v. *Prouty* (1940), 16 Cal.2d 190, 193 [105 P.2d 295]), and the paramount purpose of the whole proceeding is to serve the best interests of the child. (*Prouty* v. *Prouty, supra,* p. 195.) The sum of the matter is that the evidentiary support for the order taking three year old Charla from her mother's custody and placing her in that of her father, must be adequate, if the order is to stand.'

"And in that case the order changing custody from mother to father was reversed. In *Washburn* v. *Washburn, supra,* less than six months after the interlocutory decree of divorce which gave to the mother custody of a boy and girl aged fifteen and nine years, respectively, the father sought a modification, alleging the mother was no longer a fit and proper person to have custody. The trial court awarded custody to the father but the order was reversed on appeal. Defendant introduced the testimony of two detectives who had shadowed plaintiff, one of whom testified that he had seen plaintiff intoxicated on a dozen occasions. These detectives also testified to a visit by plaintiff to a certain doctor's apartment and a meeting between this doctor and plaintiff at Palm Springs. The court said, pages 586-587:

" 'So far as the evidence goes there is not one iota to indicate that the children did not have the best of care from their mother and *none to indicate that any of the acts or conduct of the mother of which the father complains was known to the children.* The maternal grandmother of the children lives in the mother's home and assists with the housework and the care of the children. The father is active in his business and employs a housekeeper to maintain his home; and so if the children were·to reside in his home they would be largely under the *immediate* care of a housekeeper or of a governess if he employed one, as he stated he would if awarded the custody. Moreover, so far as the record discloses the home

surroundings are the same now as when the interlocutory decree was signed.' (Italics ours.)

"Also it said, pages 587-588:

" 'In custody cases the underlying principle, paramount to all others, is the welfare and best interests of the child. In no way in conflict with this rule is another, equally well established, that once a court has decreed it there may be no change in the child's custody except where adequate cause therefor arises out of *changed conditions*. This principle is based on the idea not only that the stability of the home life of the children is an important and vital factor, but also that the turmoil of litigation must somewhere end. Short of a modification based upon adequate grounds, the decree awarding custody is conclusive and settled beyond recall other than by appeal. Moreover, the acts and conduct of one of the parties to the divorce which give offense to the other, or even to the public at large, are not a matter that calls for or permits a change of custody *unless such acts and conduct are shown to effect directly the welfare and best interests of the child*. Where a court has decreed custody to one parent, such parent may not be deprived of the custody for any supposed unfitness unless it be shown that he or she is *so unfit as to endanger the child's welfare. A custody proceeding is not one to discipline one parent for such parent's shortcomings* as an *individual* nor to reward the other for any wrong suffered therefrom. . . . Before a decree awarding custody may be vacated and the child's life unsettled the evidence must be clear and convincing that the child's welfare and best interests will be directly promoted by a change. Generally speaking, there may be no change in the custody provisions of a decree unless the material facts and circumstances occurring subsequently are of a kind to render it essential or expedient for the welfare of the child that there be a change. While each case must be solved on its own facts, there are, of course, elemental factors common to all cases that must not be overlooked. (Italics ours.)

" 'It is not open to question, and indeed it is universally recognized, that the mother is the natural custodian of her young. This view proceeds on the well known fact that there is no satisfactory substitute for a mother's love. So true is this that in this state the code exacts that she shall have custody of her child, everything else being equal, unless the child has reached the age which necessitates a particular

education or preparation for its life work. (Civ. Code, sec. 138.)'

"And the order changing custody was reversed.

"Turning now to the evidence in the case which is relied upon as justifying the order of the trial court, since that court stated that the home in which Mrs. Munson was maintaining the child was orderly, neat, clean and well kept, and petitioner admitted that the child looked healthy and well, the charges in defendant's petition that plaintiff was maintaining said child in an unfit and improper place may be said to have been disproved. In support of his charge that plaintiff had become intoxicated in the presence of the child defendant produced no testimony except his own, and while he made the general allegation that he had seen Mrs. Munson 'under the influence of liquor' several times, that he had 'seen her intoxicated once or twice a week, on an average,' he did not testify that she had been intoxicated in the presence of the child. Petitioner's charges were denied by respondent herself and by her mother and her sister-in-law with whom respondent lives. Plaintiff stated that she did take a drink now and then, but that she was not a drunkard—that she had only been in a bar once, and that was when Mr. Munson took her on the night of his birthday, on April 8th. A neighbor who lived across the street from Mrs. Munson and saw her frequently, and another neighbor who visited in the Munson home about twice a week both testified that they had never seen Mrs. Munson drunk. In *Stafford* v. *Stafford*, 299 Ill. 438 [132 N.E. 452, 20 A.L.R. 827], the court said:

"'This court would not feel warranted in holding that a man is utterly disqualified from having the care, control, and education of his children because of the fact that he has occasionally taken a drink of intoxicating liquor. If we were to adhere to that rule it would disqualify a very large per cent of men in this country in all of the occupations and professions in which men are engaged. Taking a drink of intoxicants in the presence of a child would be setting a bad example for it. So would smoking or chewing tobacco likewise be a bad example. It may be admitted that the occasional taking of a drink of liquor or the smoking or chewing of tobacco is not a special aid to a man or a recommendation, but we apprehend that no court would undertake to hold, as a matter of law, that either or both would absolutely disqualify a man from having the custody of his child, or be considered sufficient

ground for giving the custody of his child to another who has no such habit or any other bad habit.'

"In this day and age that language is equally applicable to a woman.

"As to the allegation that plaintiff 'permits a certain man to come through the window of the house where she maintains said minor and to visit her in her bedroom,' no testimony was given in support of this charge except that of petitioner himself. He testified that he once saw a man referred to as 'Tippie' go through the window of plaintiff's room at 12:45 at night. This was denied by plaintiff and its probability is discredited by the testimony of plaintiff, her mother, her sister-in-law and one of the women neighbors, all of whom testified that the window was a small one five or six feet from the ground, that it was hinged at the bottom and had a chain at the top which prevented its being opened more than a little over a foot, that it was almost connected with a window opening into the adjoining room where the sister-in-law slept. It is even discredited by Munson's own testimony that the baby's crib was directly under the window, and his statement that in the evening before he saw 'Tippie' go through the window, he had been in Mrs. Munson's home and that this man Tippie was there when he left.

"Petitioner relies heavily upon a mushy love letter written by Mrs. Munson to Tippie, but never mailed, which letter Munson purloined from the Munson home, and in which she said 'If I really thought there was any chance of your coming down, hon, I'd not only have my windows made bigger, but I'd even move out in the yard and pitch a tent, then I'd be sure you'd get in.' Whether this letter acquired by Munson in what he stated was a search for notes or information to get the custody of the child inspired his testimony, or whether it tends to corroborate it, were, perhaps, matters for the trial court. However, objection to admission of the letter in evidence was interposed, and, we think, under the circumstances should have been sustained. While there is authority in this state that, at least in criminal cases, evidence otherwise competent is not inadmissible because secured illegally and by an invasion of the constitutional rights secured by article I, section 19, of our state Constitution, on the theory stated in *People* v. *Mayen*, 188 Cal. 237 [205 P. 435, 24 A.L.R. 1383], that the Constitution and laws of the land are not solicitous to aid persons *charged with crime* in their efforts to conceal

or sequester evidence of their iniquity, and that from the necessities of the case the law countenances many devious methods of securing evidence in criminal cases, this rule has not always been applied in civil actions. In *Kohn* v. *Superior Court,* 12 Cal.App.2d 459 [55 P.2d 1186], where stolen documents were attempted to be read in evidence, the court said, in a replevin action, that if, as plaintiff claimed, the documents had been wrongfully taken, 'then it was the duty of the court to order them returned to him with as little inspection as the issues would permit and not to aid, or become a party to, the wrongful taking in any respect whatever.' (Also see *Kohn* v. *Crocker First National Bank,* 22 Cal.App.2d 246, 248 [70 P.2d 989].) But whatever may be the rule in criminal cases, and in other cases where the interests of the public are involved, where, as in the case before us, purely private rights are involved, and a party to the action has himself infringed the constitutional rights of the other party and stolen a letter from her for the purpose of using it against her in a civil action, the principle set forth in section 3517 of our Civil Code, that 'No one can take advantage of his own wrong,' becomes applicable; and we are of the opinion that the trial court in a proceeding such as this should not have permitted petitioner to take advantage of his wrong in purloining the letter, and should have refused to become a party to its use.

"Petitioner also relies upon the testimony of four witnesses called by him, who were asked their opinions as to whether he, Munson, was a fit and proper person to have custody of the child. A typical question and answer were: 'Q. In your opinion is he [Munson] a fit and proper person to have the custody of his own son? A. I would say he would be, as far as I know.' Such opinion evidence is entitled to no consideration whatever. Under section 1870, Code of Civil Procedure, opinion evidence may be given only on matters covered by subdivision 9 thereof; and except in the instances therein provided a witness must testify to facts and not opinions. (*Moore* v. *Norwood,* 41 Cal.App.2d 359, 366 [106 P.2d 939].) Opinion evidence as to the fitness of a parent to have custody of a child is inadmissible. (*Milner* v. *Gatlin,* 143 Ga. 816 [85 S.E. 1045, L.R.A. 1916B 977]; *Moore* v. *Dozier,* 128 Ga. 90 [57 S.E. 110, 112]; *Churchill* v. *Jackson,* 132 Ga. 666 [64 S.E. 691, 692, Ann.Cas. 1913E 1203, 49 L.R.A.N.S. 875]; *State* v. *Giroux,* 19 Mont. 149 [47 P. 798, 803]; *Long* v. *Smith,* (Tex.Civ.App.) 162 S.W. 25, 28-29.)

"Petitioner testified that he was boarding with a Mr. and

Mrs. Granberg, and, if awarded the custody of his child, intended to take it to their home to be cared for by Mrs. Granberg. This would mean, in effect, that the physical care and custody of this infant would be entrusted to a stranger. But it has been held in numerous cases that this cannot be done unless the natural parents of a child are found to be unfit to have such custody. This principle was restated in the very recent case of *Roche* v. *Roche*, 25 Cal.2d 141 [152 P.2d 999], where joint control of a girl eight years of age was awarded to the parents, but the physical care and control were awarded to the child's paternal grandparents. The Supreme Court quoted from *Stever* v. *Stever*, 6 Cal.2d 166, 170 [56 P.2d 1229], to the effect that 'before the court can deprive the mother of her right to the minor's custody and give her into the charge of strangers, there must be a finding that the mother is an unfit person to have the custody of her child.' Other cases so holding were cited, pages 128-129. In *Guardianship of Mathews Estate*, 169 Cal. 26 [145 P. 503], there cited, the court made a finding that the father of the minor was dead, and that the mother was 'an unfit, incompetent and improper person to have the care, custody or control' of said child. On appeal an order appointing a stranger as guardian was reversed, the court saying that the evidence relied upon as warranting a finding of incompetency 'is pitifully weak, and entirely insufficient in our judgment to warrant a conclusion that the mother is incompetent to act as guardian and should be deprived of the custody of her child.'

"In *Estate of Lindner*, 13 Cal.App. 208 [109 P. 101], in a guardianship proceeding, the court found that the mother of the minor child, a girl aged less than three years, was not a fit and proper person to have the custody of her child. The court said that the prior rights of parents to the custody of their children under fourteen years of age cannot be disregarded except *on the most compelling reasons* proven and sustained; that 'as against everyone except the father the mother is by the law of God and man entitled as of right to the custody of her own child, and of this right she cannot be deprived except upon a clear showing of her unfitness for the exercise of such right.' Also that 'A mother who is both capable and anxious to rear her own offspring should not be deprived of the opportunity to thus discharge the duty she owes the child, without a clear showing of unfitness for the trust.' And the judgment and order were reversed. (Also see *Wand* v. *Wand*, 14 Cal. 512, 517.)

"As hereinbefore stated, the order in this case awards the full custody of the child to the father, and contains no provision for the mother to even see her offspring. There is certainly nothing in this case that justifies any such deprivation. In *Allison* v. *Bryan*, 26 Okla. 520 [109 P. 934, 138 Am.St.Rep. 988, 30 L.R.A.N.S. 146], plaintiff, the mother of an illegitimate child which had been legitimized by its father and was in his custody, had been deprived by the latter of any right to see her child. She applied for and was granted an order which provided that the child should be permitted to be with her at certain times and places. On appeal the court quoted from *Haley* v. *Haley*, 44 Ark. 429, as follows:

" 'The privilege of visiting accorded to the mother is a plain dictate of humanity, in the absence of any reason to suppose that the privilege would be abused to the injury of the boy. There was none in this case. The charges of immorality against the mother were not sustained. She is shown to be an industrious, hard-working woman, and a good woman, by all the witnesses, except the defendant. But had it been otherwise the permission to visit would not be necessarily erroneous. *The courts should regard the maternal instinct in the veriest trull that walks the streets, taking proper care that it do not lead to the corruption of the offspring. It is the strongest and holiest sentiment of humanity; the freest from selfishness or impurity, and often the last hope of redemption for fallen natures.*' (Italics ours.)

"After reviewing other cases dealing with the right of visitation, the court said:

" 'From the foregoing it will be seen that under practically every and all conditions the parent, in some instances the father and in others the mother, while losing the right of custody of their children, have in every instance received at the hands of the court recognition of their right of visitation . . . the underlying reason for the rule was in each instance that the one accorded the right was a parent, and that it was in accord with humanity and right living and the best interests of the child that it should not forget and be estranged.'

"In *Copeland* v. *Copeland*, 58 Okla. 327 [159 P. 1122], the court said:

" 'The child was the legitimate offspring of a lawful marriage between the parties and was of tender years, and, though the mother may have erred, her sin did not dry up the wellsprings of mother love and forfeit all right upon her part to

visit with and enjoy the association of her own offspring. Neither does the law so declare, but recognizes this right, so long as the welfare of the child will not be endangered thereby.'

"It also cited and quoted from *Allison* v. *Bryan, supra,* and from *Haley* v. *Haley, supra,* which was quoted therein.

"We think petitioner failed to furnish evidence which justified the change of custody made by the order of the trial court. As hereinbefore stated, he agreed in a writing dated March 15, 1944, that the custody of the child should be awarded to the mother; and while such agreements are not binding upon the courts, nevertheless, as was said in *Black* v. *Black,* 149 Cal. 224, 226 [86 P. 505], courts do generally approve and adopt them, because parents, solicitous for the welfare of their offspring, have the greatest interest in determining which of them can best care and provide for them. And in *Sargent* v. *Sargent,* 106 Cal. 541, 546 [39 P. 931], it was said that 'Parents have a right to contract with each other as to custody and control of their offspring, and to stipulate away their respective parental rights; and such contracts are binding upon them.'

"Petitioner had lived with respondent from the date of their marriage, November 6, 1941, until its dissolution on March 31, 1944, part of the time in the home she now shares with her mother. He must have known when he made his agreement whether Mrs. Munson was a fit and proper mother, and his agreement indicates that he so believed. Even giving his testimony the fullest scope, we think it was inadequate to show that in the space of some seven weeks conditions had so changed and Mrs. Munson had become a person of such dissolute character that she should be deprived of the custody and care of her infant child and same be in effect awarded to a stranger. Petitioner has been free to visit with the baby, and has visited him five or six times a week. While Mrs. Munson is employed in the diet kitchen of a hospital her hours are from 8 a. m. to 1 p. m., and from 4 to 7 p. m., and during her absence from her home the child is well cared for by her sister-in-law who has a child of her own about the same age.

"Also the record contains evidence tending to show that petitioner himself is not above reproach and that his character is not of the best; but it is unnecessary to recite same. We are satisfied for the reasons above stated that other things were not unequal in this case and that this child of tender

years should be in the custody of its mother; and we cannot agree that upon the showing made it is for the best interests of this infant to be deprived of its mother's care and affection. We might add that though the Civil Code does not define the degree of fraud which under section 82 thereof will justify the annulment of a marriage, it might well be said that where, as here, plaintiff was constrained to secure the annulment of her marriage because, though the fact was unknown to her, Munson married her when he had another wife living from whom he was not divorced, that his conduct constituted such a fraud upon respondent as required the court, under section 84, *supra,* to award the custody of the child to her.''

In my opinion the order should be reversed.